Mohamed Rashid Daoud AL–
OWHALI, Plaintiff,

v.

John ASHCROFT, United States
Attorney General,
Defendant.

No. CIV.A. 02–883 RBW.

United States District Court,
District of Columbia.

Aug. 29, 2003.

Frederick H. Cohn, Esq., New York, NY, A.J. Kramer, Esq., Federal Public Defender for the District of Columbia, Washington, Counsel for Plaintiff.

Anthony J. Coppolino, Senior Trial Counsel, U.S. Department of Justice, Washington, Counsel for Defendant.

### MEMORANDUM OPINION

WALTON, District Judge.

This lawsuit involves a challenge by the plaintiff to regulations promulgated by the defendant that plaintiff alleges violate his rights guaranteed by the Fifth and Sixth Amendments of the Constitution. Because the Court concludes that plaintiff does not have standing to challenge the regulations at issue, it does not reach the merits of plaintiff's claims, and defendant's motion to dismiss the complaint is granted.

### I. Background

The plaintiff, Mohamed Rashid Daoud Al-'Owhali ("Al-'Owhali") is a citizen of Saudi Arabia. Compl. ¶ 4.[1] Al-'Owhali was indicted, along with other members of the al Qaeda terrorist organization, in connection with the bombing of the United States embassy located in Nairobi, Kenya. Compl. ¶ 6; Memorandum in Support of Defendant's Motion to Dismiss ("Def.'s Mem.") at 2. He was found guilty by a jury of the charges that had been lodged against him and thereafter was sentenced to life imprisonment without the possibility of parole[2] by the Honorable Leonard B. Sand of the United States District Court for the Southern District of New York on October 19, 2001.[3] Compl. ¶ 6. Al-'Owhali is currently serving his sentence in the United States Penitentiary, Administrative Maximum, located in Florence, Colorado, the "[f]ederal [g]overnment's highest security prison . . . ." Def.'s Mem. at 3.

In accordance with regulations that were promulgated on June 20, 1997, at the direction of the Attorney General, the Director of the Bureau of Prisons, or, upon proper delegation, its Acting Director, has the ability to

> authorize the Warden of a federal prison to implement [Special Administrative Measures ("SAMs")] that are reasonably necessary to . . . prevent actions of violence or terrorism where the Attorney General . . . provides written notification that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons.

28 C.F.R. § 501.3(a) (2003). A SAM can impose various conditions and restrictions on an inmate, such as requiring that he be housed in "administrative detention" and it may place limitations on various inmate "privileges, including, but not limited to, correspondence, visiting, interviews with . . . the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." Id. § 501.3(a). Typically, SAMs are imposed when "there

---

1. References to "Compl." are to the complaint filed by plaintiff on May 8, 2002.

2. This life sentence was mandatory as the jury was unable to reach an unanimous decision that Al-'Owhali should receive the death penalty. Plaintiff's Memorandum in Opposition to the Defendant's Motion to Dismiss ("Pl.'s Opp'n") at 2.

3. Defendant asserts that the complaint contains erroneous information regarding the date and length of plaintiff's sentence. According to defendant, plaintiff was sentenced on October 18, 2001, and he was sentenced to life without the possibility of parole plus 40 years. Memorandum in Support of Defendant's Motion to Dismiss ("Def.'s Mem.") at 3.

continues to be a substantial risk that [an] inmate's communications or contacts with other persons could result in death or serious bodily injury to persons," *i.e.*, they are designed to "prevent[ ] acts of violence and terrorism." *Id.* § 501.3(c).

Due to the nature of the crime for which the plaintiff was convicted, the Bureau of Prisons ("BOP") enacted SAMs against him, both pre-trial and post conviction, designed to lessen the potential that plaintiff could communicate with others regarding the commission of crimes that could threaten the nation's security. Compl. ¶ 7. For example, during the two years immediately prior to his trial, plaintiff was the subject of SAMs "designed to govern the special security deemed necessary by the Government and the [BOP]." *Id.* These SAMs were "authorized, supervised, and amended by [a federal] District Judge and were renewed every 120 days." *Id.* On November 15, 2002, after plaintiff's conviction, a new SAM was issued for the plaintiff, which is presently effective and is renewable annually. *Id.* ¶ 8. This SAM prohibits plaintiff "from having contract with other inmates and others ... that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate ... terrorist information." Compl., Ex. A (Notification of Special Administrative Procedures dated November 15, 2001), ¶ 1(c). The SAM also contains provisions prohibiting plaintiff from communicating with the news media, *id.* ¶ 4(a), and from sharing a cell or communicating

with other inmates. *Id.* ¶ 6(a)-(b). Plaintiff alleges that the BOP has interpreted this SAM to prevent him from watching television, listening to the radio, reading newspapers, utilizing the law library, taking an English language course, meeting with a Muslim Cleric, or calling his family,[4] although these "are all privileges that are accorded to inmates even in [the Florence Colorado] high security prison." *Id.* ¶ 9. The only justification for these restrictions, plaintiff asserts, "is the prevention of communications that are deemed a threat to the national security." *Id.*

Despite the above alleged deprivations, the gravamen of plaintiff's challenge is not directed at the SAM that currently covers him. In fact, no relief is being sought based upon the above allegations.[5] Rather, plaintiff has filed this lawsuit to specifically challenge regulations promulgated by the defendant on October 31, 2001, which is codified in 28 C.F.R. Pt. 500–501. 28. Specifically, the regulation provides, in pertinent part:

> In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism, the Director, Bureau of Prisons, shall, in addition to the special administrative measures imposed under paragraph (a) of this section, provide

---

4. Plaintiff's allegation concerning telephoning his family is in direct contravention to paragraph 3(a)(i)(1) of plaintiff's SAM which provides that "[t]he inmate is limited to nonlegal telephone calls only to/from his immediate family members." Compl. Ex. A ¶ 3(a)(i)(1). However, the SAM does provide that the duration of such calls "shall be set by BOP." *Id.* ¶ 3(a)(i)(2).

5. Moreover a judicial challenge to the SAM that currently covers plaintiff could not be mounted at this time as plaintiff concedes that he has failed to exhaust his administrative remedies in regards to the existing SAM. *See* Pl.'s Opp'n at 15 ("[I]f the [plaintiff] were challenging the SAM[ ], he would have had to at least apply, however futilely, for administrative relief.") (citing *Yousef v. Reno,* 254 F.3d 1214 (10th Cir.2001)).

appropriate procedures for the monitoring or review of communications between an inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege, for the purpose of deterring future acts that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

28 C.F.R. Pt. 501.3(d); Compl. at 7.[6] The regulations further specify, in relevant part, that if a SAM includes a provision that would authorize the monitoring of a prisoner's communications with his attorney, the BOP must notify the prisoner of its intent prior to commencing such monitoring, "[e]xcept in the case of prior court authorization." *Id.* at § 501.3(d)(2). The relevant part of the regulations regarding the notice requirement provides that:

(2) ... The notice shall explain:

(i) That ... all communications between the inmate and attorneys may be monitored, to the extent determined to be reasonably necessary for the purpose of deterring future acts of violence or terrorism;

(ii) That communications between the inmate and attorneys or their agents are not protected by the attorney-client privilege if they would facilitate criminal acts or a conspiracy to commit criminal acts ....

(3) ... To protect the attorney-client privilege ..., a privilege team shall be designated, consisting of individuals not involved in the underlying investigation. The monitoring shall be conducted pursuant to procedures designed to minimize the intrusion into privileged material or conversations. Except in cases where the person in charge of the privilege team determines that acts of violence or terrorism are imminent, the privilege team shall not disclose any information unless and until such disclosure has been approved by a federal judge.

*Id.* § 501.3.

Plaintiff alleges that these regulations "are intended to and, in fact do target" him. Compl. ¶ 11. Although the SAM applicable to plaintiff did not contain any provision for the monitoring of plaintiff's attorney-client communications, *id.* ¶ 7, he argues that "the regulations permit, and the [p]laintiff herein is in danger of, monitoring without notice on an *ex parte* application to a judge." *Id.* ¶ 13. Plaintiff is

---

6. The amended regulations alone do not constitute a SAM. Rather, these regulations permit the BOP to implement a SAM "upon written notification to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction ... that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons." 28 C.F.R. § 501.3(a). The regulations list the administrative measures that may be incorporated into a SAM, but the BOP retains discretion as to whether to include such measures in the SAM of a specific prisoner. *Id.* § 501.3(a). The BOP determines on a case-specific basis which administrative measures will be incorporated into a prisoner's SAM, and the BOP specifies in the SAM the restric- tions that will be imposed on the prisoner. Pursuant to the October 31, 2001, amendments that plaintiff is challenging, the BOP now has the discretion to include a provision in a SAM authorizing the monitoring of the prisoner's conversations with his attorney, if such monitoring is believed necessary. *Id.* at § 501.3(d). Once the SAM is created for a particular prisoner, the prisoner signs and receives a copy of the "written notification of the restrictions imposed and the basis for these restrictions," pursuant to section 501.3(b). A SAM can be implemented for a period of up to one year with the Attorney General's approval, with the BOP retaining the option to extend it annually. *Id.* at 501.3(c).

suffering harm, he argues, because he is in the "post-conviction stage of his criminal proceedings" and the monitoring of his attorney-client communications, with or without notice, "chills the attorney-client relationship and deprives the [p]laintiff . . . of the right to discuss any aspect of his case with an attorney and receive honest advice in return." *Id.* ¶ 15. Plaintiff states that such monitoring, in the absence of "a judicial determination that there is probable cause to believe that the conduct of counsel falls within a recognized exception to the attorney-client privilege is unconstitutional." *Id.* ¶ 16. Plaintiff therefore seeks a declaration that 28 C.F.R. Pts. 501.2(c) and (e) and 501.3(c), (d) and (e) violate his Fifth Amendment right to due process and his Sixth Amendment right to the assistance of counsel. *Id.* at 11. He also seeks an order enjoining the defendant and his subordinates "from monitoring consultations between [p]laintiff and his attorneys without a judicial determination that there is probable cause to believe that activity is occurring that is not protected by the privilege under procedures guaranteed to protect that right." *Id.*

## II. The Parties' Arguments

Defendant has filed a motion seeking dismissal of the complaint pursuant to Rules 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be granted). However, the essence of defendant's arguments are that this Court is without subject matter jurisdiction over plaintiff's claims because (1) plaintiff does not have standing to pursue his challenges, (2) because his claims are not ripe for judicial review, or, alternatively, (3) because plaintiff has failed to exhaust his administrative remedies.

Defendant first argues that the complaint must be dismissed because plaintiff "does not allege a past or current injury, and posits the injury on which he relies as the speculative possibility that the defendant will take a particular regulatory action against him in the future." Def.'s Mem. at 13. Thus, because the alleged injury is speculative, defendant contends that plaintiff lacks standing to advance his challenge. *Id.* On this point, defendant argues that to the extent plaintiff is alleging that he could be subjected to "surreptitious monitoring of his communications with counsel, that injury is entirely speculative[,]" and it is not permitted by the regulations, which require notification of such monitoring. *Id.* at 14. Further, defendant argues that plaintiff's claim that the regulation has a "chilling effect" on his communications with his attorney must be rejected as insufficient to establish standing in light of Supreme Court and this circuit's precedent. *Id.* at 19–22. Second, defendant argues that plaintiff's claim is not ripe for judicial review because the regulation he is challenging has not been implemented against him. *Id.* at 23. The defendant notes that under the ripeness doctrine, the Court must determine that the issue is "fit" for judicial review and that failure to grant judicial review would cause the plaintiff to suffer "irremediable adverse consequences." *Id.* at 28 (quoting *Toilet Goods, Inc. v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967)). Defendant contends that plaintiff fails to satisfy either criterion under the ripeness doctrine and therefore this Court should not exercise judicial review of his claims at this time. *Id.* Finally, the defendant argues that plaintiff's claims must be dismissed because he failed to exhaust his administrative remedies prior to initiating this action as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e)(a) (Supp. V 1999). *Id.* at 32.

In opposition to the defendant's arguments, plaintiff submits that the defendant

is attempting to use the "familiar scare tactic of 'Global Terrorism'" as an excuse for intruding into plaintiff's "well recognized constitutionally protected rights." Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n") at 6. Regarding standing, plaintiff argues that he has standing because "[a]t least one effect of the monitoring is to turn the parties to the conversation into targets." *Id.* at 7–8 (footnote omitted). Thus, because they are unaware of exactly what communications will trigger monitoring, both plaintiff and his attorneys "will be careful to the edge of paranoia about the information" they share with one another. *Id.* at 8. Plaintiff opines that this "chilling effect" that has been engendered by the regulation is a sufficiently cognizable injury to satisfy the standing requirement. *Id.* (citing *National Student Association v. Hershey*, 412 F.2d 1103, 1119 (D.C.Cir.1969)). Second, plaintiff argues that his claim is ripe for judicial review because there are no remaining facts that need to be developed and his ability to communicate with his attorney is currently being chilled by the regulation. *Id.* at 12–13. Finally, plaintiff argues that he was not required to exhaust his administrative remedies prior to initiating this lawsuit because the PLRA only applies to challenges concerning "jail conditions," and even if the monitoring is a "jail condition" he would not be obliged to exhaust his administrative remedies "until notice of intention to monitor [is] given." *Id.* at 13. Plaintiff also asserts that the BOP is "powerless to vacate a monitoring order promulgated by the Attorney General or his lawful delegates[ ]" and therefore exhausting his administrative remedies would have been futile. *Id.*

### III. Analysis

#### A. Standard of Review

█ Although defendant states in his motion that he is seeking dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), dismissal, if warranted, could be entered solely on Rule 12(b)(1) grounds. "The distinctions between 12(b)(1) and 12(b)(6) are important and well understood. Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res judicata effect." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.Cir.1987) (citation omitted). Defendant's challenges to plaintiff's complaint raise questions only concerning whether this Court has subject matter jurisdiction because they challenge whether plaintiff has standing to raise the claims he is asserting, whether such claims are ripe for judicial review, and whether plaintiff has exhausted his administrative remedies. These challenges all challenge the Court's authority to exercise subject matter jurisdiction over the dispute in this matter, which does not implicate Rule 12(b)(6).

█ "In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citations omitted). A facial challenge attacks "the factual allegations of the complaint" that are contained on "the face of the complaint," while a factual challenge is addressed to the underlying facts contained in the complaint. *Loughlin v. United States*, 230 F.Supp.2d 26, 35–36 (D.D.C. 2002) (citations omitted). "A motion to dismiss under 12(b)(1) for lack of standing ... involves an examination of the face of the complaint ... [,]" *Haase*, 835 F.2d at 908, whereas challenges regarding ripeness or failure to exhaust administrative remedies can be either facial or factual challenges. *See, e.g., Hearns Concrete Constr. Co. v. City of Ypsilanti*, 241

F.Supp.2d 803, 810 (E.D.Mich.2003) ("A Rule 12(b)(1) attack that is facial in nature, i.e., that ... does not dispute the facts underlying the ripeness of the complaint ... as opposed to [a] factual [challenge], is a direct attack on ... both the sufficiency of the pleadings and the subject matter jurisdiction of the challenged court.") (citations omitted); *Starr v. Runyon*, No. Civ.A. 94–5413, 1995 WL 455840, at *3 (E.D.Pa. July 28, 1995) (noting that because "the court ha[d] reviewed materials outside of the plaintiff's complaint in determining [the defendant] motion, defendant's argument concerning plaintiff's failure to exhaust his administrative [was] deemed a factual 12(b)(1) attack.").

■■■■ In this case, defendant argues that, from the face of the complaint, plaintiff cannot pursue his challenges because he acknowledges that the regulation he is challenging has not been applied to him. Defendant further posits that even if the regulation had been implemented against plaintiff, he has not exhausted his administrative remedies, as he is required to do, prior to initiating this lawsuit. Because these challenges, like any jurisdictional challenge, "imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001), the " 'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* at 13–14 (citations omitted). When reviewing a challenge pursuant to Rule 12(b)(1), the Court may consider documents outside the pleadings to assure itself that it has jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Haase*, 835 F.2d at 906 ("In

12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.' ") (citations omitted); *Artis v. Greenspan*, 223 F.Supp.2d 149, 152 (D.D.C.2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction, or subject-matter jurisdiction.") (citation omitted). The Court may only consider such additional evidence "to assure itself of the existence of standing." *Haase*, 835 F.2d at 907. By considering documents outside the pleadings when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the Court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits *only* a 12(b)(6) motion to be converted into a motion for summary judgment[ ]" when documents extraneous to the pleadings are considered by a court. *Haase*, 835 F.2d at 905 (emphasis in original). Throughout the Court's jurisdictional inquiry, it is plaintiff's burden to establish that the Court has jurisdiction. *Grand Lodge*, 185 F.Supp.2d at 13 (citation omitted).

### B. Standing

■■■■ Pursuant to Article III, section two of the United States Constitution, this Court has jurisdiction over "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;[and] ... Controversies to which the United States shall be a Party[.]" The Court's limited jurisdictional authority requires litigants to demonstrate that they have standing to assert their claims in federal court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

To establish standing,[7] plaintiffs must satisfy the following three-part test:

> First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not 'conjectural or hypothetical[.]' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.... Third, it must be 'likely' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable decision.'

*Id.* at 560–61, 112 S.Ct. 2130 (citations omitted). It is the burden of the party seeking to invoke federal jurisdiction to establish the existence of these elements. *Id.* at 561, 112 S.Ct. 2130 (citation omitted).

▮▮▮▮ Regarding the nature of the injury necessary for a party to have standing, such injury must be concrete. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("[p]laintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for

the proper resolution of constitutional questions."). This component of standing requires a plaintiff to demonstrate that "he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate' ..." *Id.* at 102, 103 S.Ct. 1660 (citations omitted). Plaintiff Al-'Owhali concedes that 28 C.F.R. Pt. 501.3(d), which authorizes the monitoring of attorney-client communications, has not to his knowledge been applied to him. *See* Compl. ¶ 7 ("The SAMs in force during his pre-conviction incarceration did not contain any provision for the monitoring of conversations between the [p]laintiff herein. Plaintiff has no knowledge whether there was covert monitoring, either by ex parte order or otherwise."); ¶ 13 ("[N]o notice of intention to monitor counsel's conversations has yet been given ....."). However, he nonetheless argues that he has been injured by the "chilling effect" that the regulation has and will continue to have on his communications with his attorney. Compl. ¶ 15; Pl.'s Opp'n at 8. Plaintiff relies on *National Student Ass'n v. Hershey,* 412 F.2d 1103 (D.C.Cir.1969), for his contention that "such chilling effect has been recognized as an injury within the meaning required for standing." Pl.'s Opp'n at 8. The Court disagrees.

7. There are two "types" of standing: constitutional and 'prudential.' The constitutional standing rules seek to ensure that a concrete Article III 'case or controversy' exists by focusing on plaintiff's 'harm.' They ask whether the plaintiff has 'in fact' suffered a redressable injury as a result of defendant's actions.... A plaintiff who has established the constitutional element of standing must go on to convince a court that various 'prudential' considerations also warrant hearing the case.... He must show that his 'injury' is of a sort against which the law seeks to protect him.... Or he may show that his claim falls 'within 'the

zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' ' .... Moreover, the plaintiff's challenge to the defendant's conduct ordinarily must rest on the plaintiff's own legal rights and interests, not those of third parties. *Ozonoff v. Berzak,* 744 F.2d 224, 227–28 (1st Cir.1984) (citations omitted). Defendant here challenges whether plaintiff possesses constitutional standing, *i.e.,* whether the SAM challenged by plaintiff is causing him actual or threatened injury. *See id.* at 228 (citations omitted).

In *Hershey*, the plaintiffs, who were "fifteen college student-body presidents, the president of the University Christian Movement, and three national student organizations," brought suit challenging "the celebrated 'Hershey directive' of October, 1967." *Id.* at 1105. This directive, which was actually a letter from the Selective Service Director, General Hershey, essentially provided that deferment of military service should not be granted to those registrants who committed " 'any action' violative of the Secret Service Act, regulations, or 'related processes' " as such acts would be "patently contrary to the national interest ...." *Id.* Plaintiffs challenged three facets of this directive,[8] arguing that the directive had a "chilling effect" on their "protected [rights to] protest" because "as student political associations substantially committed to anti-war or anti-draft activities ...." they engaged in such protected conduct. *Id.* at 1106. However, "none of [the plaintiffs] ... claim[ed] to have been classified or processed by a draft board." *Id.* at 1107. Nonetheless, the court held that plaintiffs had standing to challenge the deferment policy of the directive, which announced "a policy of denying relief from the obligation of military service to those who engaged in

illegal conduct which [did] not violate the Selective Service Act or regulations." *Id.* at 1117. The court reached this conclusion because although the deferment policy being challenged was "expressly directed only at 'illegal' demonstrations and interference ... the Hershey directive neither said nor meant that war protesters were to be reclassified only after a conviction for a violation of a statute which the courts have found to be consistent with the First Amendment." *Id.* at 1118. The potential reach of the directive caused the court to conclude that "it [could] deter not merely validly proscribed conduct, but any protest activity which a registrant could plausibly expect his draft board to think unprotected or illegal." *Id.* at 1118. Therefore, "the deferment policy expressly single[d] out from the infinite range of illegal conduct specific kinds of illegal acts—namely, those commonly performed by war protesters—for special treatment." *Id.* at 1119. This resulted in "an element of specificity to the threat of enforcement and ... accentuate[d] its potential chilling effect on protected expression." *Id.* The court noted that "the chill of the Hershey directive's deferment policy may [have] spread indefinitely without any judicial determination of

---

**8.** The plaintiffs in *Hershey* attacked the Hershey Directive on all three parts of the directive, the substance of which the Court said was divisible as follows:

one part defining the authority of local draft boards under the delinquency regulations, another part (Local Board Memorandum No. 85) specifically applying the delinquency procedure to registrants who mutilate or abandon their draft cards, and a third part asserting the draft boards' authority independently of the delinquency regulations to deny [deferments] to otherwise eligible registrants who engage in various illegal anti-war activities.

412 F.2d at 1115–16. The court rejected two of the three challenges. The court held that plaintiffs did not present justiciable issues as to the challenge to the delinquency regula-

tions because "the alleged chilling effect of these regulations [was] insufficient to render them justiciable without a more specific threat of enforcement[ ] [because] [t]he delinquency regulations [did] not themselves regulate expression." *Id.* at 1116. And, regarding the Local Board Memorandum No. 85, the court held that the memorandum did "not chill protected conduct" because the memorandum's "threat to enforce the [draft card] mutilation provision by a declaration of delinquency [did] not infringe First Amendment rights[ ]" due to the fact that "the threatened conduct [was] clearly defined, ... and severe punishment of conduct so defined is constitutional[.]" *Id.* at 1117. Accordingly, "the asserted predicate for justiciability disappear[ed]." *Id.*

its legality." *Id.* Therefore, the court held that the plaintiffs had standing to challenge the directive because "the appellant organizations [were] all associations of college students[ ] [whose] memberships include[d] vast numbers of men who [were] both subject to the draft and presently deferred from immediate service." *Id.* at 1120.

As a predicate for the *Hershey* court's standing ruling, the court observed that "it appears that suits alleging injury in the form of a chilling effect may be more readily justiciable than comparable suits not so affected with First Amendment interest." *Id.* at 1113 (footnote omitted). However, even in the First Amendment context, the *Hershey* court recognized that "for a number of reasons we are not persuaded that every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy." *Id.* at 1113–14. And particularly noteworthy to this Court's analysis here was the *Hershey* court's acknowledgment that although

> a plaintiff need not invariably wait until he has been successfully [and] ... directly subjected to the force of a law or policy before he may challenge it in court ... [,] the mere existence of a statute, regulation, or articulated policy is ordinarily not enough to sustain a judicial challenge, *even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms.*

*Id.* at 1110 (emphasis added).

Unlike the clear and present danger in *Hershey,* no such danger is present here. The regulation plaintiff is challenging clearly requires that as soon as a SAM monitoring a prisoner's attorney-client conversations is imposed, the prisoner must be notified of that fact and afforded the opportunity to challenge that decision, absent a court order suspending the notification requirement.[9] Moreover, in cases decided after *Hershey,* and which are more analogous to the situation currently before the Court, the Supreme Court and the District of Columbia Circuit have held that a "chilling effect" was not sufficient, in and of itself, to establish standing. *See Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1378 (D.C.Cir.1984).

---

**9.** Plaintiff alleges that although he has not yet received notice that his communications with his attorney will be monitored, "the regulations permit and the [p]laintiff herein is in danger of, monitoring without notice on an *ex parte* application to a judge." Compl. ¶ 13; 28 C.F.R. § 501.3(d)(2) ("Except in the case of prior court authorization, the Director Bureau of Prisons, shall provide written notice to the inmate and to the attorneys involved prior to the initiation of any monitoring ....."). Plaintiff therefore seeks to enjoin the defendant "from monitoring consultations between [p]laintiff and his attorneys without a judicial determination that there is probable cause to believe that activity is occurring that is not protected by the privilege under procedures guaranteed to protect that right." *Id.* at 11. Thus, to the extent that plaintiff fears that he could be monitored based on an *ex*

*parte* application to a judge, such monitoring would not be violative of his constitutional rights, as the Court cannot fathom how a judge could authorize *ex parte* monitoring without making a "determination that there is probable cause" to warrant such monitoring. *See, e.g.,* 18 U.S.C. § 2518(3) (Judge may, upon application, "enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting ... if the judge determines on the basis of the facts submitted by the applicant that(a) there is *probable cause* for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter[ ]") (emphasis added).

In *Laird,* the Supreme Court held that the plaintiffs, who had filed an action seeking a judicial declaration that the "Army's alleged 'surveillance of lawful and peaceful civilian political activity'" was unconstitutional, lacked standing to assert their claims. 408 U.S. at 2, 92 S.Ct. 2318. The surveillance that was being challenged essentially consisted of "the collection of information about public activities that were thought to have at least some potential for civil disorder . . . ." *Id.* at 6, 92 S.Ct. 2318. The main sources of the information that was being collected came from "the news media and publications in general circulation." *Id.* The plaintiffs argued that they were "chilled" in the exercise of their First Amendment rights as a result of this surveillance. *Id.* at 11, 92 S.Ct. 2318. The Court noted that a number of its recent decisions had held that "constitutional violations may arise from the deterrent, or 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Id.* at 11, 92 S.Ct. 2318 (citations omitted). However, in concluding that the *Laird* plaintiffs were without standing to pursue their claims, the Court emphasized that

> In none of these cases . . . did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject

to the regulations, proscriptions, or compulsions that he was challenging.

*Id.* at 11, 92 S.Ct. 2318.

The District of Columbia Circuit further provided further elucidation on the type of injury required for a "chilling effect" to confer standing to a plaintiff in *Reagan.* There, the plaintiffs were "political and religious organizations, private individuals assertedly active in political, religious, academic or journalistic affairs, and a Member of Congress." *Id.* at 1377. The plaintiffs challenged an Executive Order, issued by then-President Reagan, that provided, in part, that agency heads had to report potential violations of criminal laws by their employees to the Attorney General and were required to report "'any intelligence activities of their organizations that they [had] reason to believe may be unlawful'" to the Executive Branch's Intelligence Oversight Board. *Id.* (quoting regulations). The plaintiffs asserted that they suffered two types of injury as a result of the order that supported their position that they had standing:

> (1) the 'chilling' of constitutionally protected activities which they may refrain from pursuing out of fear that such activities would cause them to be targeted for surveillance under the order; and (2) the immediate threat of being targeted for surveillance, and being thereby deprived of legal rights, especially those under the First, Fourth and Fifth Amendments.

*Id.* The district court dismissed plaintiff's claims for lack of standing, except for the claims of the Member of Congress.[10]

On appeal, the circuit court affirmed the district court's lack of standing ruling. The court held that pursuant to the Supreme Court's holding in *Laird,* 408 U.S.

---

10. The claims of the Member of Congress were dismissed "under the doctrine of 'equitable discretion.'" *Reagan,* 738 F.2d at 1381 (citation omitted).

at 2, 92 S.Ct. 2318, the plaintiffs' alleged harm resulting from the "'chilling effect' which [was] produced by their fear of being subjected to illegal surveillance and which deters them from conducting constitutionally protected activities, [was] foreclosed as a basis for standing . . . ." *Id.* at 1378. The court stated that cases that have found a "chilling effect" sufficient to support standing had "involve[d] situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *Id.* The court further explained that the

> '[c]hilling effect' is cited as the *reason* why the governmental imposition is invalid rather than as the *harm* which entitles the plaintiff to challenge it. In fact, some who have successfully challenged governmental action based on 'chilling effect' grounds have themselves demonstrably *not* suffered the harm of any chill, since they went ahead and violated the governmental proscription anyway.

*Id.* at 1378–79 (emphasis in original) (citation omitted). The actual harm of a "chilling effect," the court stated, must be "distinguished from the immediate threat of concrete, harmful action." *Id.* at 1380. It is only the latter, the court held, that will support standing. *Id.* The court distinguished *Hershey*, on which the plaintiffs relied, stating that "[i]f *Hershey* establishes any principle beyond those described in [*Laird v.*] *Tatum*, it is only that we will take a more generous view of what it means to be 'prospectively subject' to a compulsion (in that case, induction into the military) where judicial review of the compulsion itself is precluded by statute." *Id.* at 1379 (citing *Hershey*, 412 F.2d at 1119). Thus, the court rejected the plaintiffs' claims that they had standing "because (1)

they ha[d] been subjected to unlawful surveillance in the past and (2) their [current] activities [put them at greater risk] such that they [were] especially likely to be targets of the unlawful activities authorized by the order." *Id.* The court, in rejecting these arguments, stated:

> Even if it were conceded that these factors place the plaintiffs at greater risk than the public at large, that would still fall far short of the 'genuine threat' required to support this theory of standing . . . as opposed to mere 'speculative' harm . . . It must be borne in mind that this order does not *direct* intelligence gathering activities against all persons who could conceivably come within its scope, but merely *authorizes* them. To give these plaintiffs standing on the basis of threatened injury would be to acknowledge, for example, that all churches would have standing to challenge a statute which provides that search warrants may be sought for church property if there is reason to believe that felons have taken refuge there. That is not the law.

*Id.* (emphasis in original).

 Similar to the plaintiffs' position in *Reagan*, plaintiff here argues that he has standing because of the "chilling effect" the attorney-monitoring regulation has on his ability to communicate with his attorney. As alleged by the plaintiffs in *Reagan*, plaintiff here alleges that the "effect of the monitoring is to turn the parties to the conversation into targets." Pl.'s Opp'n at 8; *Reagan*, 738 F.2d at 1380. However, plaintiff's "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ." *Laird*, 408 U.S. at 13–14, 92 S.Ct. 2318 (citation omitted).[11] The regu-

---

11. It is noteworthy that plaintiff is not alleging that he is actually being chilled. Rather,

lation at issue does not "direct" that plaintiff's conversations with his attorney be monitored; it "merely authorizes" that such action can be taken in the future. *See Reagan,* 738 F.2d at 1380 ("The problem with the appellants' attempt to rely upon this sort of harm to establish standing in the present case is that they have not adequately averred that any specific action is threatened or even contemplated against them."). Plaintiff merely asserts that he is "within the class of persons subject to monitoring[,]" not that he has actually been the subject of such monitoring. Thus, the posture of plaintiff's situation does not afford him standing to challenge the monitoring regulation.

The cases cited by plaintiff regarding challenges to the "facial constitutionality" of a statute, do not change the Court's conclusion. *See* Pl.'s Opp'n at 9. For example, in *Presbyterian Church v. United States,* 870 F.2d 518 (9th Cir.1989), several churches brought suit against the federal defendants "claim[ing] that the defendants violated the First Amendment by abridging the churches' right to [the] free exercise of religion and their freedom of belief, speech and association." *Id.* at 521. This claim was predicated on the fact that agents of the Immigration and Naturalization Service ("INS") had actually "entered the churches wearing 'body bugs' and surreptitiously recorded church services." *Id.* at 520. Under these circumstances, the Ninth Circuit held that the church had standing to pursue its claims. *Id.* at 521.

Specifically, the court held that the plaintiffs

> ha[d] alleged actual injuries as the result of the INS' conduct. For example, they allege[d] [that as a result of the surveillance of worship services, members ha[d] withdrawn from active participation in the churches, a bible study group ha[d] been canceled for lack of participation, clergy time ha[d] been diverted from regular pastoral duties, support for the churches ha[d] declined, and congregants ha[d] become reluctant to seek pastoral counseling and [were] less open in prayers and confessions.

*Id.* at 521–22. Thus, unlike the present case, the plaintiffs in *United Presbyterian* had suffered concrete harm as a result of the defendants' surveillance activities; they did not just allege that they were suffering a "chilling effect" based on the potential of being monitored as the plaintiff asserts.

Similarly, in *Ozonoff v. Berzak,* 744 F.2d 224, 225 (1st Cir.1984), the court held that the plaintiff had standing to challenge an executive order that required a "loyalty check" be performed on applicants for employment with the World Health Organization ("WHO"). Notably, the plaintiff, Doctor David Ozonoff, had previously undergone a loyalty check when he performed work for WHO in the past. *Id.* at 227. He challenged the executive order requiring him to undergo a second check because "the previous investigation . . . in-

---

he advances the general proposition that the potential for monitoring, with or without notice, "chills the attorney-client relationship and deprives the Plaintiff herein of the right to discuss any aspect of his case with his attorney and receive honest advice in return." Compl. ¶ 15. Furthermore, plaintiff poses the hypothetical question of whether "an attorney, under these circumstances, [can] freely speak to his client about world events as they have developed . . . in order to attempt to find

information which might generate a motion for a reduction of sentence pursuant to Rule 35 of the Federal Rules of Civil [sic] Procedure?" Pl.'s Opp'n at 8. However, the plaintiff does not assert that he has at this point been actually deprived of the effective assistance of counsel in preparing his appeal or other post-conviction relief, which, according to his opposition to the motion to dismiss, is the current status of his case. *Id.* at 1.

truded upon his privacy and injured his reputation." *Id.* Further, he asserted "that the loyalty screening program inhibit[ed] him from joining the organizations he wishe[d] to join and from expressing views or opinions that he may hold." *Id.* In holding that the plaintiff had suffered actual injury, the First Circuit stated that the plaintiff, "[a]s one who ha[d] worked for WHO in the past and who ha[d] filed an employment application again seeking work . . . [,] may feel constrained to bring his conduct into conformity with the standards that the Order contains." *Id.* at 228. Thus, unlike the plaintiff here, the plaintiff in *Ozonoff* had actually been impacted by the alleged unlawful order in the past. Moreover, the *Ozonoff* court also held that the order was

> vague enough and general enough to suggest that a serious effort to comply would have an effect—a 'chilling effect'—upon what Dr. Ozonoff says or does, particularly since his behavior in the past was evidently sufficient to trigger a full scale, rather than a cursory, investigation of his associations and activities.

*Id.* The court rejected the defendants' reliance on *Laird,* stating that the Supreme Court in *Laird* distinguished that case from cases where standing had been found to exist, namely, situations "in which the government in effect forced an individual to choose between either (1) bringing his speech or associational activity into conformity with a (typically vague) standard or (2) risking loss of an employment opportunity (or a job)." *Id.* at 229 (citations omitted). The First Circuit concluded that the case before it "thus resembles, not *Laird,* in which the Court found no standing, but rather, the cases that *Laird* distinguished, where standing was found." *Id.*[12]

Plaintiff's reliance on *Bykofsky v. Borough of Middletown,* 389 F.Supp. 836 (M.D.Pa.1975), is also fallacious. In *Bykofsky,* a parent "on her own behalf and on behalf of her son, a twelve year old minor . . ." sought a ruling from the district court "declar[ing] unconstitutional and enjoin[ing] the enforcement of a criminal ordinance . . . which impose[d] a curfew on children under the age of sixteen." *Id.* at 839. The ordinance authorized the imposition of a ten day prison sentence against the parents of a child who repeated a violation of the ordinance if the parent failed to pay a mandatory fine for a repeat violation, provided the parent had been apprised of the earlier transgression. *Id.* at 840. On the plaintiffs' motion for a preliminary injunction, which the court ultimately denied, the *Bykofsky* court rejected the defendants' argument that the plaintiffs lacked standing because "the ordinance ha[d] never been enforced against either plaintiff . . . ." *Id.* at 841. The court stated that

> [u]nlike in Laird [sic], the plaintiffs in the instant case are presently subject to an ordinance which, according to the testimony of . . . the Chief of Police of Middletown, is *always enforced* and was

---

12. Also important to the *Ozonoff* court's determination that the plaintiff had suffered injury in fact were the first amendment implications occasioned by the executive order. The court stated:

> This type of likely effect upon political activity and association has led the Supreme Court in the past to find genuinely threatened, or actual 'injury.' . . . The point of these cases seems to be that, if the plaintiff's interest in getting or keeping a job is real, the likely 'chilling effect' of an apparent speech-related job qualification constitutes a real injury—an injury that warrants judicial inquiry into the lawfulness of the qualification. A similarly concrete injury exists here, for Dr. Ozonoff seeks work with WHO and the Order likely constrains the activities of WHO job applicants.

744 F.2d at 228.

in fact enforced 16 times in 1973 and 11 times in 1974.... Thus, in contrast with the claims asserted in the Laird [sic] case, the deterrent effect complained of here is one which is grounded in a realistic fear of prosecution if the plaintiffs undertake the conduct proscribed by the ordinance.... The criminal ordinance applies to and will be invoked against the plaintiffs [if] the minor plaintiff, age 12, is present upon the public streets, highways, alleys, parks, or other public places of Middletown after 10:30 P.M. The plaintiffs, therefore, assert a sufficiently direct threat of personal detriment.

*Id.* at 841 (citations omitted). Thus in *Bykofsky* there was certainty that the challenged ordinance would be enforced against the plaintiffs if it was violated. Here, however, the SAM plaintiff challenges might never be enforced against him, as there are numerous contingencies that must first occur. On the other hand, for the parent and the minor plaintiff in *Bykofsky*, there was no question that they would suffer the effects of the ordinance since the parent was the precise target of the ordinance's scope if her son committed a repeat violation of the ordinance. Here, defendant may never invoke attorney-monitoring regulation plaintiff is attempting to challenge.

 Finally, the Court notes that its standing analysis is not altered by the fact that the plaintiff's claim has been filed pursuant to the Declaratory Judgment Act. A declaratory judgment cannot be issued "when the possibility of the injury's occurring is remote and uncertain."

*Lampkin v. Connor,* 360 F.2d 505, 509 (D.C.Cir.1966); *Atlas Air, Inc. v. Air Line Pilots Assoc.,* 232 F.3d 218, 227 (D.C.Cir. 2000) ("[u]nder the Declaratory Judgment Act, a dispute 'must not be nebulous or contingent but must have taken on fixed and final shape.") (citations omitted). Therefore, because the Court concludes that plaintiff has not alleged a sufficient injury in fact to support the Court conferring standing to him, his attempt to challenge the attorney-monitoring regulation must be rejected.

### *ORDER*

In accordance with the Court's Memorandum Opinion issued contemporaneously with this Order, it is hereby

**ORDERED** that defendant's motion to dismiss the complaint [# 4] is granted. It is further

**ORDERED** that this matter is dismissed.