Fawzi Khalid Abdullah Fahad AL
ODAH, et al., Petitioners,

v.

UNITED STATES of America,
et al., Respondents.

No. CIV.A. 02–828(CKK).

United States District Court,
District of Columbia.

Oct. 20, 2004.

Thomas B. Wilner, Neil H. Koslowe, Shearman and Sterling LLP, Washington, DC, for Plaintiffs.

Brian David Boyle, Preeya M. Noronha, Terry Marcus Henry, Robert J. Katerberg, U.S. Department of Justice, Robert D. Okun, United States Attorney's Office, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Presently before the Court is Petitioners' challenge to the United States Government's procedures regulating access of attorneys to individuals detained at the Guantanamo Bay Naval Base. This Memorandum Opinion and Order addresses the procedures as they apply to Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi.[1] Petitioners are three Kuwaiti nationals who have been detained since shortly after the September 11, 2001, terrorist attacks, and counsel working on their behalf have filed what are, in essence, petitions for writs of habeas corpus and ancillary claims. At this point, the focus of the litigation is on the habeas petitions. The Supreme Court held in *Rasul v. Bush*, 542 U.S. ——, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), that this Court has jurisdiction to consider Petitioners' claims.

Petitioners and the Government now dispute whether the three Petitioners may have access to counsel while pursuing their claims, and what limitations the Government can place on communications between the detainees and their counsel. The Government has agreed to permit meetings between the attorneys and the detainees, but subject to procedures which Petitioners argue are improper, including the audio and video real time monitoring of attorney-detainee meetings and a post hoc "classification review" of any notes taken during those meetings and legal mail between counsel and detainees. The Court now considers two narrow but crucial questions: first, whether the detainees are entitled to counsel as they pursue their claims, and second, whether the proposed monitoring and review procedures are allowable as they apply to these three detainees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the wake of the September 11, 2001, terrorist attacks, the United States Congress authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks ... or harbored such organizations or persons." Authorization for Use of Military Force, Pub.L. 107–40, §§ 1–2, 115 Stat. 224. The President subsequently deployed U.S. Armed Forces into Afghanistan to wage a military campaign against Al Qaeda and the Taliban regime. In the course of this campaign, several hundred individuals were captured and transported to the United States Naval Base at Guantanamo Bay, Cuba. Included amongst these individuals were twelve Kuwaitis, who in 2002 filed the instant suit seeking to be informed of the charges against them, to be

---

1. The remaining Petitioners in this suit have been allowed access to counsel without real time monitoring.

allowed to meet with counsel and with their families, and to have access to the courts or another impartial tribunal. Ultimately, in *Rasul,* the Supreme Court's ruling clarified that the detainees were entitled to pursue their claims in federal court. *See generally Rasul,* 124 S.Ct. at 2696.

The inquiry has now turned to whether the detainees are entitled to the assistance of attorneys in this process. On July 23, 2004, this Court set out a briefing schedule requiring the Government to file with the Court "all proposed procedures with respect to access to counsel that the Government intends to apply to the Guantanamo Bay detainees and to Petitioners in this case" and "which proposed procedures will apply to each Petitioner, including proposed monitoring of any of Petitioners' conversations with counsel." *Al Odah v. United States,* No. 02–828 at 1 (D.D.C. July 23, 2004) (scheduling order). Specifically, the Court ordered the Government to address "the legal merits of the Government's entitlement to monitor any of Petitioners' conversations with counsel." *Id.*

In its response to the Court's Order of July 23, 2004, the Government took the position that, while the detainees would be permitted to meet with counsel, they had no right to representation, constitutional or otherwise, as they pursued their claims in federal court. Resp'ts Resp. to Compl. ("Gov't Resp.") at 2, 9–23. On July 30, 2004, the Government provided a set of "Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba," which include, *inter alia,* "[w]hen authorized under these procedures, the privilege team [2] will monitor [and record] oral communications in real time between counsel and the detainee during any meetings," and a system of "classification review," whereby the privilege team will "review all written materials brought into or out of the meeting by counsel … including notes … created by counsel and/or detainee during or prior to meetings to determine their appropriate security classification." *Id.* Ex. A (Procedures for Counsel Access to Detainees, filed July 30, 2004) at 3–7. The real time monitoring of attorney-detainee meetings would only apply to certain designated detainees, while the other access procedures would apply to all detainees.[3] The Government subsequently provided guidelines

---

**2.** The "privilege team" is designed to be a neutral body "comprised of one or more [Department of Defense] attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any court, military commission or combatant status tribunal proceedings concerning the detainee." Gov't Resp. Ex. A at 1.

**3.** The attorney access procedures also require counsel to receive the appropriate security clearances, require detainees to sign acknowledgments of representation after meeting with their attorneys, allow the Government to conduct a "classification review" of legal mail between counsel and detainees, limit telephonic access to detainees, and allow the privilege team to retain monitored communications. Gov't Resp. Ex. A. at 1–7. Furthermore, in the event that the privilege team learns information it believes "reason-

ably could be expected to result in immediate and substantial harm to the national security," the access procedures allow the privilege team to disclose information about monitored communications to the Commander of JTF–Guantanamo, who in turn "may disseminate the relevant portions of the monitored communications to law enforcement, military and intelligence officials." *Id.* at 7. The procedures also allow counsel to disseminate unclassified communications from the detainees for litigation purposes, but may not divulge any classified information except under limited circumstances. *Id.* at 8. Finally, the procedures require counsel to agree to generally follow the security procedures and safeguards for the Guantanamo Bay naval base. *Id.* at 1, 8–9. These remaining issues as they relate to other detainees will be resolved at a later date.

for implementing the proposed procedures. *See* Gov't Notice of Supp. Counsel Access Procedures ("Gov't Supp. Procedures") (filed September 29, 2004).

The Government indicated that three of the detainees in this case, Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi, would be subject to the real time monitoring of their meetings with counsel. Gov't Resp. Ex. B (Lucenti Decl.). This determination was made by Brigadier General Martin Lucenti, Sr., who is the Acting Commander of the Joint Task Force Guantanamo Bay, Cuba. Brigadier General Lucenti has stated that "[i]n approving the access procedures and in applying them to the specific detainees . . ., [he] weighed the national security implications of allowing unmonitored access of these detainees to their counsel, in light of the specific intelligence information known from and about these detainees . . . ." *Id.* Ex. B at 4. The Court has been informed that these three individuals are currently the only detainees who will be subject to the real time monitoring of their conversations with counsel, and the Government has supplied Brigadier General Lucenti's explanation of why these three individuals should be treated differently than the other detainees. *See id.* Ex. B at 6–10.[4]

On August 16, 2004, this Court held a hearing to address the limited issue of monitoring attorney-Petitioner meetings, and the Government's intention to undertake a classification review of notes taken during those meetings and of legal mail sent between the attorneys and the detainees.

## II. DISCUSSION

Although there are a number of proposed Procedures for Counsel Access to Detainees that will bear on the detainees held at Guantanamo Bay, the Court has confined its present inquiry to the attorney access issues that uniquely affect the three named Petitioners in this case.[5] Accord-

---

4. Brigadier General Lucenti has stated that there is a particular concern that these three detainees would "attempt to use their [unknowing] counsel to engage in communications that would facilitate terrorist acts." Gov't Resp. Ex. B at 6. Specifically, Brigadier General Lucenti states that Petitioner al Kandari may have "served as a spiritual advisor to Usama bin Laden," and "[h]e is clearly a well-trained member of the al Qaida network with significant influence" who "has exhibited counter-interrogation methods that reveal his training by al Qaida." *Id.* Ex. B at 8. Of Petitioner al Odah, Brigadier General Lucenti states that he has admitted to having "Taliban connections and has admitted to being a member of al Qaida," he is "believed to be connected to Usama bin Laden's bodyguards," and that "al Odah's ability to communicate effectively with his comrades and leadership is not substantially reduced by the fact that he has been in detention." *Id.* Ex. B at 9. Finally, Brigadier General Lucenti states that during interrogation, Petitioner al Mutairi "has expressed his anti-American views and his desire to engage in terrorist and other violent activity against Americans," he "has an extensive history of violent assaults on detention facility personnel," and he "has demonstrated extensive knowledge of counter-interrogation techniques." *Id.* Ex. B at 10. For these three individuals, Brigadier General Lucenti expresses his belief that they "will attempt to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security if [they are] granted unmonitored communications with . . . counsel." *Id.* Ex. B at 8–10.

5. Pursuant to the United States District Court for the District of Columbia's September 15, 2004, Resolution of the Executive Session, the judges on this District Court determined that all cases pertaining to detainees held at Guantanamo Bay would be transferred to Senior Judge Joyce Hens Green for coordination and management. The judges have arranged that, as a general rule, Judge Green will rule on all procedural issues, while the original assigned

ingly, the Court considers whether the Government can impose real time monitoring on the three Petitioners. In order to make this determination, the Court first considers what entitlement the detainees have to representation by counsel while pursuing their claims in federal court. The Court then considers whether, in light of this first determination, the Government can encroach on the detainees' relationship with counsel by subjecting them to real time monitoring of their meetings, and post hoc classification review of meeting notes.

The Court finds that Petitioners are entitled to be represented by counsel pursuant to the federal habeas statute, 28 U.S.C. § 2241, the Criminal Justice Act, 18 U.S.C. § 3006A, and the All Writs Act, 28 U.S.C. § 1651. In light of this finding, the Court determines that the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them.

### A. Petitioners are Entitled to be Represented by Counsel

█ The Government argues that Petitioners have no right to counsel, under either the Constitution or any treaties or statutes. The core of the Government's position is that, in the absence of a right to counsel, any relationship they have with their attorneys is at the Government's pleasure and discretion, which in turn entitles the Government to place what limits it sees fit on that relationship. *See generally* Gov't Resp. After examining the parties' arguments, the Court determines that Petitioners are in fact entitled to be represented by counsel under the federal habeas statute, 28 U.S.C. § 2241, the Criminal Justice Act, 18 U.S.C. § 3006A, and the All Writs Act, 28 U.S.C. § 1651.

Although the Government devotes a wide swath of briefing to the question of whether Petitioners have a constitutional right to counsel, *see* Gov't Resp. at 9–21, the Court resolves the question of Petitioners' access to counsel by considering several statutes.[6] Of course, the Court is mindful of the "fundamental rule of judicial restraint," that requires it to refrain from ruling on questions of constitutional law "in advance of the necessity of deciding them." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.,* 467 U.S. 138, 157, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984); *see also Harris v. McRae,* 448 U.S. 297, 306–07, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (indicating that the courts should make decisions based on statutes rather than the Constitution when possible).

judge may rule on substantive matters pertaining to the specific case at issue. With respect to substantive matters that are common to some or all of the Guantanamo detainee cases, Judge Green and the transferring judges will determine which judge shall make the initial ruling on these issues.

6. Parties spar over the meaning of footnote 15 in the Supreme Court's decision in *Rasul.* See Gov't Resp. at 16 n. 6; Pet'rs Opp. at 8; Gov't Reply at 6 n. 1. The footnote states:

Petitioners' allegations—that, although they have engaged neither in combat nor in acts of terrorism against the United States, they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing—unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States."

*Rasul,* 124 S.Ct. at 2698 n. 15 (citation omitted). Since the Court is able to resolve this matter without considering the constitutional questions, the Court declines to referee the parties' dispute over whether the Supreme Court's language was intended to identify a constitutional right to counsel.

The Supreme Court's holding in *Rasul* has made it clear that this Court has jurisdiction to consider Petitioners' "habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base" brought under 28 U.S.C. § 2241, as well as Petitioners' claims brought under 28 U.S.C. § 1331, the federal question statute, and 28 U.S.C. § 1350, the Alien Tort Statute.[7] *Rasul,* 124 S.Ct. at 2692–99. In *Rasul,* the Supreme Court stated that "Petitioners contend that they are being held in federal custody in violation of the laws of the United States. No party questions the District Court's jurisdiction over petitioners' custodians. Section 2241, by its terms, requires nothing more." *Id.,* 124 S.Ct. at 2698 (citation omitted). Consequently, the Court held that "§ 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention . . . ." *Id.*

◼ The case law surrounding both the federal habeas statute, 28 U.S.C. § 2241, and the analogous state habeas statute, 28 U.S.C. § 2254, as well as the All Writs Act, 28 U.S.C. § 1651, permits this Court to fashion procedures by analogy to existing procedures, in aid of the Court's jurisdiction and in order to develop a factual record as necessary for the Court to make a decision on the merits of Petitioners' habeas claims. In addition to the authority to issue writs of habeas corpus under 28 U.S.C. § 2241, the All Writs Act states that the courts "may issue all writs necessary or appropriate in aid of their respec-

tive jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Court's decision to grant an order under the All Writs Act is "within the sound discretion of the court." *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 25, 63 S.Ct. 938, 87 L.Ed. 1185 (1943). In reaching its conclusion, the Court considers the Supreme Court's decision in *Harris v. Nelson,* 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), in which the Supreme Court held that "a district court may, in an appropriate case, arrange for procedures which will allow development . . . of the facts relevant to disposition of a habeas corpus petition." *Id.* at 298, 89 S.Ct. 1082.

The Supreme Court reasoned in *Harris,* that "[p]etitioners in habeas corpus proceedings . . . are entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of the relevant facts." *Id.* at 299, 89 S.Ct. 1082. The Supreme Court noted that, although Congress has clearly charged the courts with the duty to consider the facts of habeas petitions, Congress has been "largely silent" on the details of how this should be done. *Id.* Accordingly, the Supreme Court held that "[c]learly . . . the habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage. Where their duties require it, this is the inescapable obligation of the courts," and the courts' authority to fashion these

---

7. After the Supreme Court's decision in *Rasul,* the Government raised a question of whether the United States District Court for the District of Columbia is the proper forum for the resolution of a petitioner's claims in another suit brought by a detainee, *Gherebi v. Bush,* No. 04–1164 (D.D.C. filed July 12, 2004). Judge Green ruled on this question, finding that the Supreme Court's ruling in

*Rasul* "makes it clear that this Court is the appropriate forum for the resolution of the Guantanamo Bay detainee cases," because the Supreme Court found that the United States courts have jurisdiction over the cases, and then determined that remand of the cases to the District of Columbia was appropriate. *Gherebi v. Bush,* 338 F.Supp.2d 91, 96 (D.D.C.2004) (ruling on proper forum).

procedures is "expressly confirmed in the All Writs Act, 28 U.S.C § 1651." *Id.* Relying on the All Writs Act, the Supreme Court explained that "when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held," the court "may issue such writs and take or authorize such proceedings with respect to development . . . of the facts relevant to the claims advanced by the parties, as may be 'necessary or appropriate in aid of [its jurisdiction] . . . and agreeable to the usages and principles of law.'" *Id.* at 300, 89 S.Ct. 1082 (citation omitted).

█ It is clear then, that Petitioners are entitled to present the facts surrounding their confinement to the Court. It is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to

their detention. *See Harris,* 394 U.S. at 300, 89 S.Ct. 1082 ("Obviously . . . the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the 'usages and principles of law.'"). This encompasses the authority to appoint counsel to represent habeas petitioners. The habeas statute, 28 U.S.C. § 2241, does not specifically address the appointment of counsel.[8] However, the Criminal Justice Act, 18 U.S.C. § 3006, permits the use of public funds to appoint counsel "[w]henever . . . the court determines that the interests of justice so require." 18 U.S.C. § 3006A(a)(2). The Criminal Justice Act specifically contemplates the appointment of counsel in the habeas context, listing it as one of several circumstances in which representation may be provided.[9] *See* 18 U.S.C. § 3006A(a)(2)(B) (including both federal habeas actions under 28 U.S.C.

8. If the federal habeas corpus statute did address the issue of appointment of counsel, the Court would not be in a position to look to the All Writs Act. *See Pa. Bureau of Corr. v. United States Marshals Serv.,* 474 U.S. 34, 43, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985) ("The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling.").

9. The Government argues that the Criminal Justice Act is inapplicable to these proceedings because Petitioners "are not being held on criminal charges," and consequently the Act "cannot serve as a source of authority for any right to counsel here." Gov't Reply at 8. The Court is unpersuaded by the Government's argument, because it misconstrues the manner in which the Criminal Justice Act applies to the case at bar. The Court has not found that Petitioners' entitlement to counsel is grounded in the dictates of Criminal Justice Act; rather, the Court, acting pursuant to its discretionary authority to fashion procedures in aid of its jurisdiction over habeas actions, finds that the Criminal Justice Act provides a

useful and persuasive procedural approach with which to inform its decision regarding representation by counsel for Petitioners.

The Government cites to a case from the Eleventh Circuit, *Perez–Perez v. Hanberry,* 781 F.2d 1477 (11th Cir.1986), in which that court indicated that the Criminal Justice Act "provide for the appointment of counsel in *criminal* proceedings or in those proceedings 'intimately related to the criminal process.'" *Id.* at 1480 (citation omitted). However, the Government's reliance on this nonbinding case is misplaced. As a number of subsequent cases have pointed out, *Perez–Perez* relies on a narrow reading of a portion of the statute that has since been amended. *See, e.g., Chamblin v. INS,* 176 F.Supp.2d 99, 104 (D.N.H.2000); *Saldina v. Thornburgh,* 775 F.Supp. 507, 509 (D.Conn.1991). The 1986 amendment removed the term "collateral relief," on which the analysis in *Perez–Perez* relied, and "Congress did not insert any qualification on the scope of section 3006A(a)(2)(B). As noted by *Saldina,* the reliance of the *Perez–Perez* decision on a term that is no longer included in the statute 'logically restricts application' of the case." *Chamblin,* 176 F.Supp.2d at 104 (citing *Saldina,* 775 F.Supp. at 509).

§ 2241 and state habeas actions under 28 U.S.C. § 2254). Although Petitioners' habeas claims have been brought pursuant to the federal habeas statute, the Court also notes that Rule 8 of the Rules Governing § 2254 Cases authorizes appointment of counsel pursuant to the Criminal Justice Act at any stage of the habeas proceedings. *See* R. Governing § 2254 Cases 8.

Again by analogy to state habeas proceedings, the Court looks to the Eighth Circuit's decision in *Battle v. Armontrout*, 902 F.2d 701 (8th Cir.1990). In that case, the Eighth Circuit considered several factors in determining whether a habeas petitioner was entitled to be represented by counsel. The court considered whether the petitioner's claim was "nonfrivolous," and "whether the nature of the litigation will make the appointment of counsel of benefit to the litigant and the court." *Id.* at 702. The court found that in order to make these determinations, it was necessary to consider "the pro se litigant's ability to investigate facts and present claims," as well as "the complexity of the factual and legal issues" raised by the petition. *Id.* The court ultimately determined that the district court should have appointed counsel because the petitioner's ability to investigate the facts surrounding his detention was "seriously impaired by his incarceration," and "the factual and legal issues [were] sufficiently complex" that counsel was necessary "to develop [petitioner's] arguments and focus the court's analysis." *Id.*

Applying the Eighth Circuit's reasoning, this Court finds that Petitioners in the instant case have clearly presented a nonfrivolous claim. They have been detained virtually incommunicado for nearly three years without being charged with any crime. To say that Petitioners' ability to investigate the circumstances surrounding their capture and detention is "seriously impaired" is an understatement. The circumstances of their confinement render their ability to investigate nonexistent. Furthermore, it is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation. Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system. Finally, this Court's ability to give Petitioners' claims the "careful consideration and plenary processing" which is their due would be stymied were Petitioners to proceed unrepresented by counsel.

The Supreme Court has found that Petitioners have the right to bring their claims before this Court, and this Court finds that Petitioners cannot be expected to exercise this right without the assistance of counsel. Although as the Government maintains, the habeas statute may not confer an absolute right to counsel, *see* Govt' Reply at 8, the law provides this Court with the discretionary authority to have counsel represent Petitioners in the habeas context. Therefore, the Court, in its discretion and pursuant to this authority, finds that Petitioners are entitled to counsel, in order to properly litigate the habeas petitions presently before the Court and in the interest of justice.

### B. The Government May Not Abrogate the Attorney–Client Privilege

■ Having determined that Petitioners are entitled to representation while pursuing their claims, the Court turns now to the Government's intention to impose limitations on Petitioners' relationship with counsel. Specifically, the Court addresses the Government's proposed real time monitoring of Petitioners' meetings with their attorneys, and the Government's intention

to review attorney notes[10] taken during these meetings and legal mail sent between the attorneys and detainees. After considering the Government's proposed procedures in light of their impact on the attorney-client relationship, the Court finds that the Government's proposed procedures inappropriately burden that relationship, and that national security considerations can be addressed in other ways.

The Government proposes to engage in real time monitoring of meetings between the three detainees and their counsel, and to conduct a "classification review" of any written materials brought into or out of these meetings and of the detainees' legal mail. The Government's proposed real time monitoring would include, *inter alia,* audio and/or video recording of the meetings in their entirety, and would entitle the privilege team to terminate a meeting at any time if the team were to find that the detainee or attorney were "attempting to defeat or frustrate the monitoring of communications" or were "[c]onveying information in furtherance of terrorist or other criminal operations or that reasonably could be expected to result in immediate and substantial harm to the national security." Gov't Resp. Ex. A at 5. The classification review, designed to "ensure the proper handling of classified information [and] determine its appropriate security classification," would allow the privilege team to "review all written materials brought into or out of the meeting by counsel or counsel's staff, including notes, drawings or other writings created by counsel and/or the detainee." *Id.* Ex. A at 6. Counsel would also be required to provide the privilege team with copies of any documents they want to leave with the

detainee 14 days prior to the meeting, and would be required to allow the privilege team to review any legal or court papers prior to sharing these with the detainee. Gov't Supp. Procedures Ex. C at 1. The Government also proposes to conduct a classification review of all legal mail between counsel and detainees. Gov't Resp. Ex. A at 6.

As a justification for this monitoring and classification review, the Government's briefs raise a number of concerns centering around national security. As a general matter, the Government argues that in order to protect the national security, it needs the opportunity to classify information to which counsel have access in the course of Petitioners' representation. The Government does not express concern that the attorneys are rogues who might intentionally undermine national security interests. Rather, the Government is concerned that allowing counsel unmonitored access to these three detainees would enable them to "pass sensitive information about military detention facilities, the security at such facilities, or other military operations, including specific circumstances of capture to other terrorists through unwitting intermediary attorneys—something that members (and presumably supporters) of terrorists organizations are trained to do." Gov't Resp. at 27. The Government is concerned that the detainees may possess classified information, that the attorneys might learn and then disclose to others, potentially resulting "in immediate and substantial harm to national security." *Id.* The Government's concern also travels in the other direction, considering the possibility that the "attorneys may disclose—perhaps even unknow-

---

**10.** The parties have not discussed at any length the notes that Petitioners themselves may take. However, to the extent that meeting notes include both the attorneys' notes

and those of Petitioners, the Court determines that they should be treated in the same manner.

ingly—sensitive and classified information to detainees, who could then pass the information on to other detainees as well as to terrorists outside of United States custody." [11] *Id.*

The Government's base-line position that it "is permitting access [to counsel], subject to conditions," does not serve to inform the Court's analysis because the Court has found that Petitioners' access to attorneys is not a matter of Government discretion. Gov't Resp. at 23. Consequently, the Court's argument that the conditions it seeks to impose "should be considered reasonable *per se* " is inapposite. *Id.* at 24. Leaving this aside, the Government argues that its "procedures governing counsel access are more than reasonable and permit petitioners to obtain assistance of counsel in this habeas proceeding, while still maintaining essential national security protections." *Id.*

The Court finds that the Government's position is both thinly supported and fails to fully consider the nature of the attorney-client privilege. The Government has not presented the Court with law sufficient to sustain their proposed inroads into Petitioners' relationship with their attorneys. The privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system in the United States. The Supreme Court has stated that

> [t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote

broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (internal citation omitted).

Indeed, the "privilege 'is founded upon the necessity, in the interests and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.' " *Id.* (quoting *Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888)). The privacy of communications between attorney and client is crucial to this relationship. *See, e.g., Mann v. Reynolds,* 46 F.3d 1055, 1061 (1995) (invalidating prison policy preventing contact visits between inmates and attorneys because prison "policies will not be upheld if they unnecessarily abridge the defendant's meaningful access to his attorney and the courts. The opportunity to communicate privately with an attorney is an important part of that meaningful access.") (quoting *Ching v. Lewis,* 895 F.2d 608, 609 (9th Cir.1990)); *Bach v. Illinois,* 504 F.2d 1100, 1102 (7th Cir.1974) ("An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important. We think that contact with an attorney and the

---

**11.** Although the Government was careful to omit this from their briefs, at the August 16, 2004, hearing the Government also indicated that it plans to exploit the "intelligence value" of monitoring Petitioners' conversations with counsel. Tr. of August 16, 2004, Hearing at 67–70 (Government: "[T]here could be im-

portant intelligence insights derived from these communications that would not be derived from the interrogations that have occurred thus far .... I don't understand why the court would think that problematic if the information is not going to be used to test the legality of their detention.").

opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."); *Adams v. Carlson*, 488 F.2d 619, 631 (7th Cir.1973) (recognizing "that the effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context.").[12]

Furthermore, the courts have protected an attorney's notes taken in the course of representation. The Supreme Court has rejected attempts by the Internal Revenue Service to obtain "written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties," noting that "it is essential that a lawyer work with a certain degree of privacy," and that if discovery of the material was allowed "much of what is now put down in writing would remain unwritten .... Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice .... And the interests of the clients and the cause of justice would be poorly served." *Upjohn*, 449 U.S. at 397–98, 101 S.Ct. 677 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

The Government's proposal that it monitor these meetings and conduct a classification review of meeting notes flies in the face of the foundational principle of the attorney-client privilege. In fact, the courts have found that intrusion by the government, in particular, would lay waste to the value of the attorney-client privilege. *See Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (noting that the "fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications through electronic eavesdropping."); *United States v. DiDomenico*, 78 F.3d 294, 299 (7th Cir.1996) (presenting a hypothetical where the government records conversations between criminal defendants and their lawyers without turning the recordings over to the prosecution, and remarking that the practice would "greatly undermine the freedom of communication between defendants and their lawyers and with it the efficacy of the right to counsel, because knowledge that a permanent record was being made of the conversations ... would make the defendants reluctant to make candid disclosures.").

In proportion to the importance granted the attorney-client privilege, the District of Columbia Circuit Court takes the strictest position on its waiver. This Circuit utilizes the traditional approach that any disclosure of privileged material works a waiver of the privilege. *See In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989) ("The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. We therefore agree with those courts which have held that the privilege is lost even if the disclosure is inadvertent." (citations omitted)).

---

12. The Government argues that these cases can be distinguished from the instant litigation because the cases deal with criminal defendants at trial or post-conviction, and that Petitioners are not entitled to the same constitutional protections as a criminal defendant. Gov't Reply at 13–15. However, the case law indicates that where the client has been afforded the right to meaningful access to the courts, this right cannot be abridged, and that the ability to communicate in private with counsel is a crucial part of that meaningful access. *See Mann*, 46 F.3d at 1061; *Ching*, 895 F.2d at 609; *Bach*, 504 F.2d at 1102. In the instant case, Petitioners have been afforded access to the courts, which must necessarily be meaningful, and this meaningful access includes the opportunity to consult with counsel in private.

The Government attempts to erode this bedrock principle with a flimsy assemblage of cases and one regulation. The Government presents no case law, nor any statutory basis indicating that monitoring of attorney-client communications is permissible. Instead, the Government cites to various cases and a Bureau of Prisons regulation that do not support their proposed procedures. The Government relies on the district court decision in *Padilla ex rel. Newman v. Bush*, 233 F.Supp.2d 564 (S.D.N.Y.2002), another case dealing with a detainee at Guantanamo Bay, for the proposition that "there is no reason that military personnel cannot monitor Padilla's contacts with counsel, so long as those who participate in the monitoring are insulated from any activity in connection with this petition, or in connection with a future criminal prosecution of Padilla." *Id.* at 604; Gov't Resp. at 24–26. However, this case does not have the force of law, because its holdings were later reversed, *see* *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir.2003); *Rumsfeld v. Padilla*, —— U.S. ——, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004), and in any event, this portion of the district court's opinion was pure dicta and contained virtually no analysis in support of this statement.[13]

The only example produced by Government specifically addressing the possibility of monitoring attorney-client meetings is a Bureau of Prisons Regulation, 28 C.F.R. § 501.3,[14] which was cited briefly in *Padilla*, 233 F.Supp.2d at 604. This regulation authorizes the director of the Bureau of Prisons to implement special administrative measures where there is a "reasonable suspicion ... that a particular inmate may use communications with attorneys ... to further or facilitate acts of terrorism ...." 28 C.F.R. § 501.3(d). The director may "provide appropriate procedures for the monitoring or review of communications between that inmate and attorneys ... who are traditionally covered by the attorney-client privilege ...." *Id.* The only case addressing even tangentially the monitoring feature of this regulation is *Al–Owhali v. Ashcroft*, 279 F.Supp.2d 13 (D.D.C. 2003), in which Judge Reggie B. Walton of this Court found that the prisoner did not have standing to challenge the monitoring provision. Therefore, there is no case law

**13.** The other cases the Government cites are similarly unpersuasive, because they are inapplicable to the Government's proposal to monitor attorney-client meetings. For instance, *United States v. Bin Laden*, 58 F.Supp.2d 113, 118 (S.D.N.Y.1999), held that the court had the authority to compel a defense attorney to obtain a Department of Justice security clearance before permitting access to classified materials. The Second Circuit in *United States v. El–Hage*, 213 F.3d 74, 81 (2d Cir.2000), held that a prisoner's isolation from the general population was reasonably related to prison security concerns, despite the detainee's argument that his isolation prevented him from preparing his own defense. The court in *El–Hage* was not faced with any type of monitoring, and in fact, the decision cites to *United States v. Felipe*, 148 F.3d 101, 110 (2d Cir.1998), in which the Second Circuit upheld a restriction, "including a virtual ban on communi-

cations with others, *aside from ... Felipe's attorney ....*" *Id.* (emphasis added). In *Massey v. Wheeler*, 221 F.3d 1030 (7th Cir. 2000), the Seventh Circuit upheld the denial of a prisoner's request for unusually frequent unmonitored phone calls with his attorney, because the prisoner had no pending court dates or visits from attorneys, and only sparse legal mail, and federal regulations only prohibited limitations on unmonitored phone calls to an attorney when the prisoner could demonstrate that correspondence, phone calls and visits were insufficient.

**14.** The Government does not argue that this regulation is being applied to Petitioners, so the propriety of this regulation is not for the Court to decide. Rather, the Government presents this regulation as an example of monitoring attorney-prisoner communications.

considering the propriety of this regulation, and the mere fact that such a regulation exists is not, itself, sufficient to persuade the Court that such monitoring is proper.

The Court is acutely aware of the delicate balance that must be struck when weighing the importance of national security against the rights of the individual. However, the Government has supplied only the most slender legal support for its argument, which cannot withstand the weight of the authority surrounding the importance of the attorney-client privilege.

In response to the Government's legitimate national security concerns, the Court proposed a specific framework for counsel access at the August 16, 2004, hearing, which would allow counsel to meet with Petitioners unmonitored. *See* Tr. of August 16, 2004, Hearing at 14–18. Counsel for Petitioners have agreed to work within this proposed framework, even while recognizing the significant limitations it places on them if they want to have unmonitored communications with their clients.[15] *Id.* at 44. The Government was unwilling to concede that this proposed framework would fully address its national security concerns, but did not indicate why this proposal would be insufficient, except for unsubstantiated speculation that the attorneys would fail to follow the proposed system. *Id.* at 25–27, 30.

This framework would allow for one attorney to meet with each Petitioner, and the attorney-client privilege would cover their communications. *Id.* at 14. The attorney would be required to treat all information subject to the attorney-client privilege as confidential, and would not disclose this information to anyone. *Id.* In the event that the attorney wanted to disclose the information to anyone, including law firm colleagues or support staff, counsel would have to agree to the Government's proposed classification review, and would have to abide by the Government's decision to approve or prohibit the disclosure, if based on properly asserted national security concerns.[16] *Id.* Although the Court set out its framework at the hearing as a possible way to allow counsel to have unmonitored meetings with Petitioners, at this stage the Court shall consider the attorneys' notes taken during those meetings and legal mail between counsel and Petitioners under the same rubric. If counsel agree to treat all these written communications as confidential, and to submit the written communications for classification review in the event that the individual attorney wants to disclose the information to anyone, the Court shall consider them covered by the attorney-client privilege, and exempt from review under the proposed framework.[17]

The Court's framework also proposed a protective order, consistent with the District of Columbia Rules of Professional Conduct, requiring counsel to disclose to

---

**15.** The Court notes that counsel for Petitioner Habib, *see Habib v. Bush,* No. 02–1130 (D.D.C. filed June 10, 2002), also agreed that the Court's proposal was reasonable and that he would accept the Court's proposed framework. *See* Tr. of August 16, 2004, Hearing at 54–55.

**16.** The only possible exception to this rule would be court filings. Tr. of August 16, 2004, Hearing at 14. The Court recognizes that the parties and the Court would need to discuss what procedures would be followed for court filings, and whether counsel can include the information at issue in filings under seal and/or *in camera* without submitting them for a classification review.

**17.** The Court notes that counsel for Petitioners and the Government would need to have significant discussions surrounding the securing and transportation of notes taken during the meetings.

the Government any information from the detainee involving future events that threaten national security or involve immediate violence. *Id.* at 15. The attorney-client privilege does not cover the intention to commit a crime, and under the District of Columbia Rules of Professional Conduct counsel would be permitted to disclose any information gleaned in the course of their representation about future threats to national security to the Court. *See* D.C.R. Prof'l Conduct 1.6(c)(1) ("A lawyer may reveal client confidences and secrets, to the extent reasonably necessary ... [t]o prevent a criminal act that the lawyer reasonably believes is likely to result in death or substantial bodily harm ...."); *see also* D.C.R. Prof'l Conduct 1.6(d)(2) ("A lawyer may use or reveal client confidences or secrets ... [w]hen ... required by law or court order ....").

Counsel would be required to have a security clearance at the level appropriate for the level of knowledge the Government believes is possessed by the detainee, and would be prohibited from sharing with the detainee any classified material learned from other sources. *Id.* The Court pointed out that the Government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance. *Id.* at 16. Furthermore, any attorney granted the clearance would receive appropriate training with respect to the handling of classified information, commensurate with the level of clearance granted and the type of classified material to which the attorney would be expected to have access. *Id.* The Court also indicated that there are significant statutory sanctions relating to the

misuse or disclosure of classified information. *Id.* at 17; *see, e.g.,* 18 U.S.C. § 793 (addressing sanctions for gathering, transmitting or losing defense information); 18 U.S.C. § 798 (addressing sanctions for disclosure of classified information). Finally, the Court's framework presupposes full compliance by Petitioners' counsel.

With respect to the three Petitioners, the Court finds that the Government's national security concerns can be addressed by the framework the Court proposed at the August 16, 2004, hearing and detailed above. The arrangement proposed by this Court would require a protective order under which counsel for Petitioners would be required to treat all information they received from Petitioners as confidential, in order to avoid the monitoring provisions of the Government's proposed procedures. In the event that counsel intended to disclose anything in connection with this case, counsel would be required to permit the Government to review for classification purposes whether such information is in fact confidential, or whether it is appropriate for disclosure.[18] The Rules of Professional Conduct, read in conjunction with such a protective order, and having identified all information as confidential (in the absence of the Government's proposed monitoring procedures), would subject counsel to any and all penalties for disclosure.

## III.  CONCLUSION

After careful consideration of the parties briefs' and the relevant law, the Court finds that Petitioners are entitled to be represented by counsel. The federal habeas statute, 28 U.S.C. § 2241, the Criminal Justice Act, 18 U.S.C. § 3006A, and the All Writs Act, 28 U.S.C. § 1651, operate to-

---

**18.** If the privilege team determines that the information "reasonably could be expected to result in immediate and substantial harm to the national security," which presumably

counsel did not perceive, the information can be disseminated to the appropriate authorities. Gov't Resp. Ex. A at 7.

gether to create this entitlement. In light of this holding, the Court further determines that the Government's proposed real time monitoring and classification review procedures for legal mail and attorney notes impermissibly burden the attorney-client relationship and abrogate the attendant attorney-client privilege.

The Court has proposed a framework, under which counsel for Petitioners would be allowed unmonitored access to their clients and unreviewed written notes and legal mail so long as they agree to treat all information obtained in the course of Petitioners' representation as classified. The Court finds that this alternative framework would sufficiently address the Government's national security concerns, while retaining the protections that accompany Petitioners' representation by counsel. Accordingly, the Court shall deny the Government's proposal to impose these conditions on Petitioners' access to counsel, contingent on Petitioners' compliance with the Court's proposed framework.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is this 20th day of October, 2004, hereby

ORDERED that the Government's motion [46] to conduct real time monitoring of meetings between counsel and Petitioners Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi, and to conduct a classification review of notes taken during these meetings and of legal mail sent between these Petitioners and counsel is DENIED, contingent on Petitioners' compliance with the framework set out by the Court at the August 16, 2004, hearing, and to which Petitioners agreed.