990 So.2d 344 (2008)
Ex parte SAFEWAY INSURANCE COMPANY OF ALABAMA, INC.
(In re Michelle J. Galvin
v.
Clifford W. Monday, an individual; and Safeway Insurance Company of Alabama, Inc., a corporation).
1061613.
Supreme Court of Alabama.
February 29, 2008.
*345 J. Mark Hart of Haskell Slaughter Young & Rediker, LLC, Birmingham, for petitioner.
James H. Wettermark of Wettermark Holland & Keith, LLC, Birmingham, for respondent.
STUART, Justice.
Safeway Insurance Company of Alabama, Inc., petitions this Court for a writ of mandamus directing Judge J. Scott Vowell of the Jefferson Circuit Court to vacate his order denying its motion to dismiss Michelle J. Galvin's bad-faith claim against it and to enter an order dismissing that claim without prejudice. We grant the petition and issue the writ.

Facts
Safeway issued an insurance policy to Galvin that included uninsured-motorist ("UM") coverage; that policy was in effect *346 on March 31, 2006, when Galvin's automobile was struck by an automobile driven by Clifford W. Monday.
On April 16, 2007, Galvin filed a complaint, alleging claims of negligence and wantonness against Monday and a claim of bad-faith failure to pay an insurance claim against Safeway and asserting a demand for the payment of UM benefits under the policy. According to Galvin's complaint, Galvin was injured in the accident and Monday, an uninsured motorist at the time of the accident, was driving while intoxicated. Galvin further stated that after she filed a claim for UM benefits with Safeway, Safeway "refused to negotiate in good faith to pay the appropriate proceeds of the [UM] policy to [her] to compensate her for her injuries and damages." Specifically, she averred:
"As the insurance carrier for the Plaintiff, Michelle J. Galvin, the Defendant, Safeway Insurance Company of Alabama, Inc., had a duty to negotiate in good faith with the Plaintiff and to fairly and promptly pay the proceeds of her insurance policy with Safeway to her following a covered event.
"The Defendant, Safeway Insurance Company of Alabama, Inc., breached its duty of fair dealing. Instead, the Defendant refused to negotiate in good faith with Mrs. Galvin, needlessly delayed the payment of proceeds which are due her under the uninsured motorist policy, repeatedly engaged in obstructionist tactics to delay the payment of the claim, and otherwise acted in bad faith in its dealings and negotiations with Mrs. Galvin and her representatives."
On May 20, 2007, Safeway filed a motion to dismiss pursuant to Rule 12(b)(1), Ala. R. Civ. P., alleging that the trial court lacked subject-matter jurisdiction over the bad-faith claim. Safeway argued that this Court's holding in Pontius v. State Farm Mutual Automobile Insurance Co., 915 So.2d 557, 565 (Ala.2005), that "there can be no bad-faith action based on conduct arising before the uninsured motorist's liability is established and damages are fixed...." required dismissal of the bad-faith claim for lack of subject-matter jurisdiction. Safeway argued that Galvin's bad-faith claim was not ripe for adjudication and that it should be dismissed because the amount of damages had not yet been fixed.[1] Safeway stated:
"The amount of [Galvin's] damages against Monday have not been fixed. There is a dispute about the amount of those damages. It will take a trial of the accident claim to fix the damages. Because the amount of damages is not fixed, the claim for bad faith for the failure to pay [uninsured-motorist] benefits is not ripe, the court lacks subject matter jurisdiction of that claim, and it is to be dismissed without prejudice under Pontius."
On June 27, 2007, Galvin filed a response, attaching in support of her argument that the bad-faith claim against Safeway should not be dismissed an affidavit of her attorney, James H. Wettermark. Wettermark averred as follows:
"This is a clear case of liability. Mrs. Galvin was struck by a drunk driver who apparently had been convicted on multiple previous occasions for drunk driving. She incurred $15,884 in medical bills.
"Because the defendant driver was uninsured, on Mrs. Galvin's behalf, I made a claim for uninsured motorist benefits from her uninsured motorist carrier, Safeway Insurance Company of Alabama.

*347 "I made an initial settlement demand on Safeway on August 31, 2006. For the next seven months, Safeway refused to negotiate in good faith. Rather, they made an initial offer of $10,000 on October 4, 2006. This offer is less than the medical specials on a case of clear liability.
"I repeatedly requested that Safeway at least engage in good faith negotiations. I was never successful at getting them to make any additional offers.
"Throughout the entire time, Mrs. Galvin has not had money with which to pay her medical bills. Many of them remain unpaid to this date. She paid good premiums for uninsured motorist coverage for just this sort of occurrence. Now, her insurance company has simply refused to negotiate with her in [good] faith.
"This is not a case where there is a reasonable dispute over a fair settlement. Safeway has yet to make an offer that even equals the medical bills in a case of clear liability. Rather, this is a clear-cut case where Safeway has simply obfuscated, dragged their feet, and otherwise refused to negotiate in good faith with its own insured to timely settle a claim."
On July 5, 2007, the trial court denied Safeway's motion to dismiss. Safeway filed a motion for reconsideration. In its motion, Safeway, relying on Pontius, argued that because the amount of damages had not been fixed and Safeway did not have all Galvin's medical records relating to the accident, Safeway could not have engaged in bad faith in failing to negotiate in good faith and that, consequently, the claim was not ripe for adjudication and should be dismissed. In support of its motion for reconsideration, Safeway attached an affidavit from Richard Mizell, Safeway's assistant claim manager. Mizell averred:
"The auto accident occurred on March 31, 2006. The accident involved a minor impact....
"The insured did not seek medical attention the day of the accident. Three days later she visited her primary care physician who diagnosed her with sprains of the neck, shoulder and wrist and prescribed pain medication. Three days later the insured began treating with a chiropractor and had twenty-six visits to the chiropractor over a two-month period. The insured did not receive evaluation or treatment by a medical doctor during this time.
"A June 2006 MRI showed osteophyte formation with no neural compromise and a small herniation at C5-6. The insured then traveled to Georgia for further diagnostic studies. The findings were to continue with conservative treatment and to possibly have an MRI (it appears from that record that the Georgia physician was unaware the insured had an MRI in Birmingham earlier that week).
"Ultimately, the insured submitted medical bills of approximately $15,000. Blue Cross, however, paid only $3,929.62 of the bills (Blue Cross sought subrogation of this amount).... The medical bills themselves did not show the charges which Blue Cross reduced or did not correlate Blue Cross payments with `write-offs' with specific charges. Therefore, Safeway requested the explanation of benefit forms (`EOB's') from the insured so it could analyze the discrepancy between the bills submitted and the Blue Cross subrogation amount for this accident. The EOB's were important to determine what treatments and injuries were proximately caused by *348 this accident given the low amount of the Blue Cross subrogation.
"This analysis was especially important because plaintiff had many prior, unrelated medical problems. On her pharmacy records submitted to Safeway, plaintiff blacked out several prescription medications she took. The prescription she did not black out showed she was on four different pain medications after the accident....
"The insured also contended [Monday] had been convicted of DUI [driving under the influence] from this accident. The police report did not show any alcohol use. Safeway could not find a record that [Monday] was convicted of DUI. Therefore, Safeway wrote [Galvin] asking for records showing the DUI conviction, but [Galvin] never furnished this information.
"Safeway paid [Galvin's] collision damage benefit and med pay benefits after the accident. On August 31, 2006, [Galvin] demanded that Safeway pay $80,000 or the uninsured motorist policy limits (which were $60,000). On October 4, 2006, Safeway responded with an opening counteroffer of $10,000. [Galvin] never made another offer in response before filing suit. The insured had not complied with Safeway's request for EOB's to help complete analysis of the value of [her] personal injury claim when she filed suit on April 16, 2007. In Safeway's evaluation, the insured has not submitted evidence establishing that she is entitled to recover the $60,000 uninsured motorists limits, and that the extent of the damages to which she is entitled to recover from the uninsured motorist are unknown."
On August 2, 2007, the trial court denied Safeway's motion for reconsideration. On August 10, 2007, Safeway filed its petition for a writ of mandamus in this Court, requesting this Court to order the trial court to dismiss the bad-faith claim against it.
Standard of Review
"`The question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus.' Ex parte Liberty Nat'l Life Ins. Co., 888 So.2d 478, 480 (Ala.2003). However, `[f]or the writ of mandamus to issue "`[t]he right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief.'"' Ex parte Vance, 900 So.2d 394, 398-99 (Ala.2004)."
Ex parte Tuscaloosa County Special Tax Bd., 963 So.2d 610, 611-12 (Ala.2007).
"This Court has consistently held that the writ of mandamus is an extraordinary and drastic writ and that a party seeking such a writ must meet certain criteria. We will issue the writ of mandamus only when (1) the petitioner has a clear legal right to the relief sought; (2) the respondent has an imperative duty to perform and has refused to do so; (3) the petitioner has no other adequate remedy; and (4) this Court's jurisdiction is properly invoked. Ex parte Mercury Fin. Corp., 715 So.2d 196, 198 (Ala. 1997)."
Ex parte Flint Constr. Co., 775 So.2d 805, 808 (Ala.2000).

Discussion
Safeway contends that it has a clear legal right to the dismissal of Galvin's bad-faith claim against it because, it says, the claim is not ripe for adjudication and, therefore, the trial court lacks subject-matter jurisdiction. According to Safeway, Galvin's damages are contested and unliquidated and, thus, a bad-faith claim is premature. Safeway presented its challenge to subject-matter jurisdiction in its *349 motion to dismiss, alleging, pursuant to Rule 12(b)(1), Ala. R. Civ. P., that the trial court did not have subject-matter jurisdiction of the bad-faith claim because Galvin's damages were not fixed, and the claim was thus not ripe.
The United States District Court for the District of Columbia provided an excellent discussion of the two types of challenges to jurisdiction a defendant can assert by a Rule 12(b)(1), Fed.R.Civ.P.,[2] motion, stating:
"Once a defendant has moved to dismiss a case pursuant to Rule 12(b)(1), `the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence.' Erby v. United States, 424 F.Supp.2d 180, 182 (D.D.C.2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); see also Al-Owhali v. Ashcroft, 279 F.Supp.2d 13, 21 (D.D.C.2003) (Walton, J.) (`Throughout the Court's jurisdictional inquiry, it is plaintiff's burden to establish that the Court has jurisdiction.'). `The [C]ourt, in turn, has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.' Abu Ali v. Gonzales, 387 F.Supp.2d 16, 17 (D.D.C.2005) (internal quotations omitted).
"A court ruling on a Rule 12(b)(1) motion to dismiss `may consider documents outside the pleadings to assure itself that it has jurisdiction.' Al-Owhali, 279 F.Supp.2d at 21; see also Haase v. Sessions, 835 F.2d 902, 906 (D.C.Cir. 1987) (`In 12(b)(1) proceedings, it has been long accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy itself on [its] authority to entertain the case.' (internal citations and quotation marks omitted)). The level of scrutiny with which the Court examines the allegations in the complaint that support a finding of jurisdiction, however, depends upon whether the motion to dismiss asserts a facial or factual challenge to the court's jurisdiction. See I.T. Consultants v. Pakistan, 351 F.3d 1184, 1188 (D.C.Cir.2003).
"Facial challenges, such as motions to dismiss for lack of standing at the pleading stage, `attack[] the factual allegations of the complaint that are contained on the face of the complaint.' Al-Owhali, 279 F.Supp.2d at 20 (internal quotation marks and citation omitted). `If a defendant mounts a "facial" challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party.' Erby, 424 F.Supp.2d at 181; see also I.T. Consultants, 351 F.3d at 1188. The court may look beyond the allegations contained in the complaint to decide a facial challenge, `as long as it still accepts the factual allegations in the complaint as true.' Abu Ali, 387 F.Supp.2d at 18; see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253-54 (D.C.Cir.2005) (`At the pleading stage.... [w]hile the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, the court must still accept all of the factual allegations in the complaint as true.' (internal citations and quotation marks omitted)).

*350 "Factual challenges, by contrast, are `addressed to the underlying facts contained in the complaint.' Al-Owhali, 279 F.Supp.2d at 20. Where a defendant disputes the factual allegations in the complaint that form the basis for a court's subject matter jurisdiction, `the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant.' Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C.Cir.2000). Instead, a court deciding a Rule 12(b)(1) motion asserting a factual challenge `must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.' Id. In such situations, `the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties.' Erby, 424 F.Supp.2d at 181 (internal quotations omitted); see also Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1976[1977]) (holding that a court ruling on a factual challenge to its jurisdiction is not required to accept the plaintiff's factual allegations as true, but rather `is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case ... and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims')."
Lindsey v. United States, 448 F.Supp.2d 37, 42-43 (D.D.C.2006). Thus, a Rule 12(b)(1) motion can allege either a facial challenge, in which the court accepts as true the allegations on the face of the complaint, or a factual challenge, which requires consideration of evidence beyond the face of the complaint.
In Pontius, this Court provided a well-reasoned analysis of a facial challenge to a trial court's subject-matter jurisdiction over a bad-faith claim. After recognizing that this Court, when reviewing a trial court's ruling on motion to dismiss based on a facial challenge to the trial court's subject-matter jurisdiction, must not afford the trial court's ruling a presumption of correctness and must accept the allegations in the complaint as true, see Newman v. Savas, 878 So.2d 1147 (Ala.2003), we considered the allegations in the Pontiuses' complaint and concluded that the complaint on its face did not establish that the trial court had subject-matter jurisdiction over the bad-faith claim. We stated:
"State Farm contends that the face of the Pontiuses' amended complaint clearly demonstrates that a legitimate dispute exists concerning liability and damages arising out of the underlying accident.[3] State Farm argues that Alabama law does not recognize a cause of action for breach of contract or bad-faith failure to pay an insurance claim in the context of UIM [underinsured-motorist] coverage until liability and damages have been fixed. In other words, State Farm argues that there must be a conclusive determination of liability and damages before State Farm, as the plaintiff's liability carrier, can be liable for breach of contract or bad faith, and that there can be no breach-of-contract or bad-faith claim against the UIM carrier arising out of the investigation, evaluation, or processing of the UIM claim before there is a judgment or settlement of the underlying suit.

*351 "This Court has held that `there can be no breach of an uninsured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover.' Quick v. State Farm Mut. Auto. Ins. Co., 429 So.2d 1033, 1035 (Ala.1983). In LeFevre v. Westberry, 590 So.2d 154, 159 (Ala.1991), we stated:
"`Uninsured motorist coverage in Alabama is a hybrid in that it blends the features of both first-party and third-party coverage. The first-party aspect is evident in that the insured makes a claim under his own contract. At the same time, however, third-party liability principles also are operating in that the coverage requires the insured to be "legally entitled" to collectthat is, the insured must be able to establish fault on the part of the uninsured motorist and must be able to prove the extent of the damages to which he or she would be entitled. The question arises: when is a carrier of uninsured motorist coverage under a duty to pay its insured's damages?
"`There is no universally definitive answer to this question or to the question when an action alleging bad faith may be maintained for the improper handling of an uninsured or underinsured motorist claim; the answer is, of course, dependent upon the facts of each case. Clearly, there is a covenant of good faith and fair dealing between the insurer and the insured, as with direct insurance, but the insurer and the insured occupy adverse positions until the uninsured motorist's liability is fixed; therefore, there can be no action based on the tort of bad faith based on conduct arising prior to that time, only for subsequent bad faith conduct.'
"....
"In the present case, Pontius did not have to obtain a judgment against the Martins before she joined State Farm as a defendant in her claim for UIM benefits. See State Farm Fire & Cas. Co. v. Lambert, 291 Ala. 645, 285 So.2d 917 (1973). As to her bad-faith claim arising out of her UIM coverage with State Farm, Pontius had to demonstrate that she was `legally entitled to recover' damages for bad-faith failure to pay under the policy, and she `"must be able to establish fault on the part of the uninsured motorist, which gives rise to damages and must be able to prove the extent of those damages."' LeFevre, 590 So.2d at 157, quoting Quick, 429 So.2d at 1035. `[W]here a legitimate dispute exists as to liability, whether under primary coverage or uninsured motorist coverage, a tort action for bad faith refusal to pay a contractual claim will not lie.' Bowers v. State Farm Mut. Auto. Ins. Co., 460 So.2d 1288, 1290 (Ala.1984). Breach of an insurance contract is an element of a bad-faith-failure-to-pay claim. Ex parte Alfa Mut. Ins. Co., 799 So.2d 957 (Ala.2001). `There can be no breach of an insurance contract providing uninsured-motorist coverage until the insureds prove that they are legally entitled to recover.' Ex parte State Farm Mut. Auto. Ins. Co., 893 So.2d 1111, 1115 (Ala.2004).
"We agree with State Farm that Pontius's breach-of-contract and bad-faith claims were not ripe for adjudication. Without a determination of whether liability exists on the part of the underinsured motorist and the extent of the plaintiff's damages, a claim of bad-faith failure to pay or breach of contract is premature. The trial court properly dismissed the claims because the claims were not ripe for adjudication. However, as discussed earlier, State Farm's motion challenges the subject-matter jurisdiction *352 of the court. A dismissal for lack of subject-matter jurisdiction does not operate as an adjudication on the merits. See Ex parte Capstone Dev. Corp., 779 So.2d 1216 (Ala.2000)(a dismissal for lack of subject-matter jurisdiction is treated as a dismissal without prejudice to the plaintiff's right to reinstitute the action)."
Pontius, 915 So.2d at 563-64. Thus, because State Farm presented a facial challenge to the trial court's subject-matter jurisdiction and our examination of the allegations made in the Pontiuses' complaint indicated that liability and damages were in dispute, we concluded that the dismissal without prejudice of Pontius's bad-faith claim against State Farm was proper.
In this case, Galvin's complaint appears facially sufficient to show that the trial court has subject-matter jurisdiction over Galvin's bad-faith claim against Safeway. She avers that liability for the accident is uncontested and that the damages are undisputed. Safeway, however, in the form of Mizell's affidavit, presented the trial court with evidentiary material indicating that the damages were not fixed but were contested.[4] Hence, Safeway's motion presented a factual challenge to the trial court's subject-matter jurisdiction.
Safeway has established a clear legal right to a writ of mandamus because Safeway presented unrefuted evidence indicating that the damages are in dispute and, in accordance with Pontius, Galvin's bad-faith claim, as a matter of law, is not ripe; consequently, the trial court does not have subject-matter jurisdiction over the claim. Safeway presented evidence to the trial court in the form of an affidavit from Mizell indicating that the damages were not fixed but were in controversy. In the affidavit, Mizell explained that Safeway had been unable to determine from the documentation provided by Galvin "what treatments and injuries were proximately caused by this accident." Galvin did not present any evidence refuting Mizell's statement that she had not provided all the documents requested by Safeway or indicating that Safeway had not contested the extent of damages. Therefore, she did not satisfy her burden of establishing factually that her bad-faith claim is ripe and that the trial court has jurisdiction to entertain her bad-faith claim against Safeway. See OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir.2002)("In the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists."). Accordingly, Safeway has established a clear legal right to a dismissal without prejudice of Galvin's bad-faith claim because that claim is not ripe for adjudication,[5] and, consequently, the trial court lacks subject-matter jurisdiction. "[T]here can be no bad-faith action based on conduct arising before the uninsured motorist's liability is established and damages are fixed; therefore, `there can be no action based on the tort of bad *353 faith based on conduct arising prior to that time, only for subsequent bad faith conduct.'" Pontius, 915 So.2d at 565 (quoting LeFevre, 590 So.2d at 159).

Conclusion
Safeway has established a clear legal right to the dismissal without prejudice of Galvin's bad-faith claim against it. Therefore, we issue the writ directing the trial court to vacate its order denying Safeway's motion to dismiss and to order that Galvin's bad-faith claim against Safeway be dismissed without prejudice.
PETITION GRANTED; WRIT ISSUED.
COBB, C.J., and SEE, LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the result.
MURDOCK, Justice (concurring in the result).
I concur in the result reached by the majority opinion because I agree that, given the state of the record in this action, the plaintiff's bad-faith claim is premature. I am not persuaded, however, that the concept of "ripeness" is the appropriate concept by which to describe the problem with the plaintiff's claim. And I especially am not persuaded that the problem here is of a jurisdictional nature. For all that appears, this is a case in which the plaintiff simply is unable to demonstrate that the wrongful conduct she alleges to have occurred, actually has occurred. Addressing such circumstances is one of the purposes for which summary judgment is made available under Rule 56, Ala. R. Civ. P.[6]
The concept of "ripeness" is much criticized as a concept of "vague and ill-defined nature and complexity." See, e.g., Edward B. Sears, Lujan v. National Wildlife Federation: Environmental Plaintiffs Are Tripped up on Standing, 24 Conn. L.Rev. 293, 329 (1991). Nonetheless, the definition of "ripeness" provided by the United States Supreme Court is consistent with the view that that concept is not apposite in this case. That definition suggests that a wrongful "decision," or other wrongful action already has occurred, but that injury is not yet sufficiently "concrete" to make judicial evaluation appropriate. Specifically, the Court has defined ripeness as "a justiciability doctrine designed `to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way....'" National Park Hospitality Ass'n v. Department of the Interior, 538 U.S. 803, 807, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (emphasis added) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Thus, as I have always understood it, the concept of ripeness was not designed to address circumstances where the would-be defendant has not even committed the bad act upon which a claim against him might be based, but to "determine[] whether the administrative action that has already occurred is appropriate for judicial review." Robert C. Power, Help is Sometimes Close at Hand: The Exhaustion Problem and the Ripeness Solution, 1987 U. Ill. L.Rev. *354 547, 614 (1987) (emphasis added). "Ripeness, thus, evaluates the suitability for review of existing agency action from a judicial viewpoint...." Id. (emphasis added). If something does not exist, that is, if a tort has not yet occurred, it can be neither "ripe" nor "unripe."[7]
In the present case, however, the undisputed evidence indicates that there has been no "decision" or other "action" as to which a bad-faith claim could be brought. Based on the specific materials before us, it must be concluded that there has been no bad-faith failure to investigate the plaintiff's policy claim, nor has their been a decision to deny benefits, much less a decision to deny benefits that was made in bad faith. The insurer, according to the undisputed evidence, is still in the process of conducting a good-faith, reasonable investigation.
If we nonetheless are to attach the label of "ripeness," then, at a minimum, we should recognize that we are in fact using that concept to measure the substantive sufficiency of the plaintiff's claim, or at least the substantive sufficiency of the plaintiff's proof at this juncture, that a wrongful act or decision by the insurer already has occurred. I believe we unnecessarily confuse our jurisprudence, and set a precedent that may have unforeseen consequences in future cases, to go the further step of holding that this brand of ripeness implicates the trial court's jurisdiction.[8] As this Court aptly observed recently:
"Subject-matter jurisdiction concerns a court's power to decide certain types of cases. Woolf v. McGaugh, 175 Ala. 299, 303, 57 So. 754, 755 (1911) (`"By jurisdiction over the subject-matter is meant the nature of the cause of action and of the relief sought."' (quoting Cooper v. Reynolds, 77 U.S. (10 Wall.) 308, 316, 19 L.Ed. 931 (1870))). That power is derived from the Alabama Constitution and the Alabama Code. See United States v. Cotton, 535 U.S. 625, 630-31, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (subject-matter jurisdiction refers to a court's `statutory or constitutional power' to adjudicate a case). In deciding whether Seymour's claim properly challenges *355 the trial court's subject-matter jurisdiction, we ask only whether the trial court had the constitutional and statutory authority to try the offense with which Seymour was charged and as to which he has filed his petition for certiorari review.
"Under the Alabama Constitution, a circuit court `shall exercise general jurisdiction in all cases except as may be otherwise provided by law.' Amend. No. 328, § 6.04(b), Ala. Const.1901 [§ 142, Ala. Const. 1901 (Off.Recomp.)].... As a result, the State's prosecution of Seymour ... was within the circuit court's subject-matter jurisdiction, and a defect in the indictment could not divest the circuit court of its power to hear the case."
Ex parte Seymour, 946 So.2d 536, 538 (Ala.2006). By the same token, a complaint may suffer from a defect in pleading or proof, but that fact "does not divest the circuit court of the power to [decide] the case."
At oral argument in this case, more than one member of this Court had questions regarding the breadth of discovery that might be available if premature claims of bad faith against insurers are allowed to be coupled with actions to establish coverage. I was one of those members, and I am concerned about the answer to those questions. That issue is not before us in this case, however. Moreover, I believe concerns over this issue can be addressed in one or more other ways that are more straightforward jurisprudentially and that do not incorrectly invoke the concepts of ripeness and, especially, subject-matter jurisdiction.
NOTES
[1] Safeway did not dispute Galvin's assertion in her complaint that Monday, at the time of the accident, was liable or that he was uninsured or underinsured.
[2] "Federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure, which were patterned after the Federal Rules of Civil Procedure." Hilb, Rogal & Hamilton Co. v. Beiersdoerfer, 989 So.2d 1045, 1056 n. 3 (Ala.2007).
[3] The allegations in the Pontiuses' complaint indicated that liability for the accident and the amount of damages, if any, were in dispute.
[4] See Committee Comments on 1973 Adoption, Rule 12, Ala. R. Civ. P. (providing that a trial court may consider affidavits when a motion to dismiss attacks jurisdiction). See Williams v. Skysite Commc'ns Corp., 781 So.2d 241, 245 (Ala.Civ.App.2000). Consideration of Mizell's affidavit, even though it was presented on motion for reconsideration of the trial court's denial of Safeway's motion to dismiss, is proper. See Mobile & Gulf R.R. v. Crocker, 455 So.2d 829 (Ala. 1984).
[5] Ripeness is defined as "[t]he circumstance existing when a case has reached, but has not passed, the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made" or "[t]he requirement that this circumstance must exist before a court will decide a controversy." Black's Law Dictionary 1353 (8th ed.2004).
[6] Alternatively, where the pleading itself is insufficient, as the main opinion suggests was the case in Pontius v. State Farm Mutual Automobile Insurance Co., 915 So.2d 557 (Ala.2005), the remedy could, as appropriate, be a motion under Rule 12(b)(6), Ala. R. Civ. P. (failure to state a claim) or Rule 12(c), Ala. R. Civ. P. (judgment on the pleadings). See note 8, infra.
[7] I have always understood "ripeness," at least in the justiciability context, as typically focusing upon the "concreteness" of the plaintiff's injuries. As two commentators have put it, the purpose of the doctrine is "to sift out cases that involve speculative injuries that may never cause concrete harm." Sarah Helene Duggin and Mary Beth Collins, "Natural Born" in the USA: The Striking Unfairness and Dangerous Ambiguity of the Constitution's Presidential Qualifications Clause and Why We Need to Fix It, 85 B.U. L.Rev. 53, 116 (2005) (footnote omitted). "[R]ipeness focuses on whether the plaintiff's alleged injury either actually has occurred or is sufficiently likely to occur that the issues are concretely framed and judicial resolution is not deemed unnecessary." Id. (footnote omitted).
[8] As one commentator has suggested, the ripeness doctrine has in fact been used by federal courts in recent years "to measure the demands of substantive statutory or constitutional causes of action," but "[t]his application of the doctrine does not relate to jurisdictional power at all. Instead, it is an aspect of actionability analysis  that is, the determination of whether the litigant has stated a claim on which relief can be granted.... See Fed. Rule Civil Proc. 12(b)(6)." Gene R. Nichol, Jr., Ripeness and the Constitution, 54 U. Chi. L.Rev. 153, 162 (1987) (emphasis added) (footnote omitted) (acknowledging that "ripeness decisions are often substantive rulings in another form," but expressing the view that this "use of the doctrine is [not] illegitimate," id. at 169). In the context of a federal Art. III analysis, the same commentator states that it would seem to be "a major mistake, however, to confuse this sort of inquiry with the application of a constitutional barrier to the exercise of judicial power" and concludes that "[i]t is probably a mistake to characterize this method of analysis as jurisdictional at all." Id. at 169-70 (emphasis added).